[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11720

_____

D.C. Docket No. 2:13-cr-00121-SPC-DNF-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONALD FRANCIS CROTEAU,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 11, 2016)

Before HULL, JULIE CARNES and BARKSDALE,[*] Circuit Judges.

HULL, Circuit Judge:

_____

[*]Honorable Rhesa H. Barksdale, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Following a jury trial, Ronald Croteau appeals his conviction and 56-month sentence for ten counts of making false, fictitious, or fraudulent claims on his tax returns, in violation of 18 U.S.C. § 287 and 2, and one count of corruptly interfering with the administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a).  Croteau appeals both (1) the sufficiency of the evidence supporting the jury's verdict, and (2) the procedural and substantive reasonableness of his sentence.  After reviewing the parties' briefs and the record, and after the benefit of oral argument, we affirm.

## I.  BACKGROUND

### A.    Offense Conduct

The eleven-count indictment against defendant Croteau charged that from September 2008 to September 2010, Croteau filed at least ten false income tax returns with the IRS and created, submitted, and recorded various other false, fictitious, or fraudulent documents with the IRS and other government entities. We recount the evidence presented to the jury, viewing that evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict.  United States v. Hunt, 526 F.3d 739, 744 (11th Cir. 2008).

In September 2008, defendant Croteau filed three false and fraudulent tax returns for tax years 2006, 2007, and 2008.  In these returns, Croteau reported that he was entitled to refunds totaling approximately $400,000 for these years.

2

Croteau signed the forms under penalty of perjury, and he requested that the refunds be deposited into his bank account.

As substantiation for his tax returns, Croteau separately mailed to the IRS "transmittal-of-information" forms with attached 1099-OID (Original Issue Discount) forms purportedly issued to him by various financial institutions. The 1099-OID forms reported that the financial institutions had issued interest income to Croteau and had withheld sums for federal tax purposes. Croteau's tax returns sought refunds of the money withheld.[1] Not only was the financial information in these forms false, but so were the forms themselves. None of the financial entities listed on Croteau's 1099-OID forms had issued any interest income, much less withheld such income for which Croteau sought a refund. In response, a month later in October 2008, the IRS mailed Croteau a letter notifying him that he had provided the IRS with frivolous tax information.[2]

In November 2008, after Croteau submitted amended tax returns for 2006, 2007, and 2008, which still contained fictitious and fraudulent information, the IRS

_____

[1]A 1099-OID form is an income-reporting document issued by financial institutions to purchasers of debt instruments such as bonds. The purchaser buys the debt instrument from the financial institution at a price discounted from the instrument's value at maturity. The difference in purchase price and value at maturity is taxable income that must be amortized and reported by the tax payer incrementally over the life of the loan. See generally United States v. Hesser, 800 F.3d 1310, 1320-21 (11th Cir. 2015) (discussing mechanics and tax implications of OID interest income and 1099-OID forms).

[2]Croteau's attempted fraud was identifiable to the IRS because a tax return that reports that a taxpayer's withheld income is identical to his 1099-OID income is inherently frivolous. The amount of withholding reflected on a valid 1099-OID form is always less than the amount of income paid because interest income is not taxed at 100%.

3

sent Croteau another letter.  The letter warned Croteau that the tax return information he had submitted in September 2008 contained frivolous tax information, which reflected "a desire to delay or impede the administration of Federal tax laws."  The letter explained that "[f]ederal courts, including the Supreme Court of the United States, [had] considered and repeatedly rejected, as without merit, positions" that Croteau had taken in his tax returns.

The IRS gave Croteau 30 days in which to file corrected information and threatened to impose a $5,000 penalty if he did not or if he again submitted a frivolous tax return.  The IRS included with the letter a copy of a publication entitled "Why Do I Have to Pay Taxes?" and urged Croteau to seek advice from a competent tax professional or qualified attorney.  Croteau promptly contacted the IRS in December 2008 requesting the IRS to cancel the 2007 and 2008 returns he had filed because the amounts were incorrect, and he indicated that he would contact his accountant.  The IRS responded with a letter thanking Croteau for his cooperation.

Over the course of the next two years, this pattern repeated itself as (1) Croteau would submit tax returns claiming hundreds of thousands of dollars in refunds based on false and fraudulent financial information, (2) Croteau would likewise submit false and fraudulent supporting financial information to substantiate his returns in the form of fraudulent 1099-OID forms containing false

income and withholding information, which the banks had not actually issued, (3) the IRS would then warn Croteau that it had discovered his frivolous submissions and that he was required to submit corrected information or be penalized, and (4) Croteau would then respond by admitting that he had made mistakes in his filings.  The IRS assessed Croteau with three $5,000 penalties in total.  The IRS never issued any refunds to Croteau because it successfully identified all his tax returns and refund information as being frivolous.

Yet again, in April 2009, Croteau filed two more frivolous tax returns containing false and fraudulent information.  He filed a 1040 form for 2007 by mail, and he filed one for 2008 electronically.  In his 2007 return, Croteau reported that he had earned taxable interest and total income of $147,557, that he owed taxes of $32,977, that $146,665 had been withheld, and that he was due a refund of $113,688.  In his 2008 return, Croteau reported that he had earned taxable interest and total income of $1,000,011, that he owed taxes of $325,877, that $952,958 had been withheld, and that he was due a refund of $627,081.  As before, Croteau submitted false and fictitious 1099-OID forms purportedly issued by several financial institutions as substantiation for his tax returns.

In May 2010, Croteau submitted two virtually identical false and frivolous 2009 tax returns claiming a refund of $957,670 based on tax payments he

5

purportedly had made in 2008.  He submitted one of these tax return forms by mail and the other electronically.  Both his claimed tax payments and returns were false.

Then, in September 2010, Croteau mailed another false and frivolous 2007 tax return but altered the form to pertain to 2008.  His supporting documentation likewise pertained to 2008.  Croteau claimed a refund of $538,733.  He also attached bogus 1099-OID forms purporting to show that 100% of his OID interest income had been withheld.

None of the financial institutions had actually issued the various 1099-OID forms that Croteau submitted along with his tax returns.  These financial institutions also had no records that substantiated the information in Croteau's forms.

The IRS also had no record that Croteau had been paid 1099-OID interest income for tax years 2006, 2007, or 2008.

During much of this span, Croteau availed himself of the IRS's Filing Information Returns Electronically ("FIRE") system, an online computer system that businesses and financial institutions typically use to submit information returns to the IRS.  The IRS uses these information returns to verify information that individual tax payers submit in their personal tax returns.  Croteau used the FIRE system to submit dozens of 1099-OID information files to the IRS between March 2009 and September 2010 in support of his various tax return submissions.

Also from 2008 to 2012, Croteau created, submitted, and recorded various fictitious and fraudulent documents claiming rights to millions of dollars owed him by the U.S. Treasury and various government agencies and officials.  For example, Croteau sent multiple fictitious and fraudulent financial instruments resembling stock certificates to the Secretary of the Treasury claiming $300 million in bonds. Croteau asked the Secretary to deposit the bonds for credit into Croteau's "private offset account."  Next to his signature on these documents, Croteau affixed a fingerprint.  A government witness from the U.S. Department of the Treasury testified that though Croteau's fictitious and fraudulent bond instruments exhibited "indicia or hallmarks . . . intended to make [them] appear genuine," other features of the documents including the terminology used made it apparent that the documents were "nonsense."

Croteau also recorded several false, fictitious, and fraudulent liens and documents in the Lee County Clerk's office asserting that the IRS and various IRS officials owed him hundreds of millions of dollars in total.  In August 2008, Croteau signed and recorded a "Notice of Lien, Diplomatic Immunity and Identity Bond on Land" and a "Private Discharging and Indemnity Bond" for $300 million. A month later, in October 2009, Croteau recorded a "Constructive Notice & Formal Complaint" printed on "Croteau & Associates The Law Men Group" letterhead.  This document stated that "Ronald-Francis of the family Croteau" had

discharged debt to the IRS totaling $1,973,692.17 from his Federal Reserve Bank trust account and that he had used the 1099-OID and 1099-A processes to discharge his tax payments for 2007 and 2008.  The document also stated that the IRS and certain IRS employees and officials owed Croteau $1.3 million.  None of the people named in these liens or complaints ever had business dealings with Croteau, and none owed him money.

## B.    Indictment and Trial

On August 21, 2013, a grand jury indicted Croteau with ten counts of filing false, fictitious, and fraudulent tax returns with the IRS, in violation of 18 U.S.C. § 287 and 2.  Croteau was charged for ten of the false and fraudulent tax returns he filed between September 2008 and September 2010 for tax years ranging from 2006 to 2009, in which he claimed total refunds in excess of $3.8 million.  Separately, the grand jury indicted Croteau with one count of corruptly interfering with the administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2.  This charge was based on the alleged false and fraudulent tax returns covered by Counts One through Ten as well as the supplementary submissions supporting the tax refunds including the 1099-OID forms, the separate fictitious and fraudulent instruments Croteau submitted to the U.S. Treasury Department, and the fictitious and fraudulent liens and documents he recorded in the Lee County Clerk's office.

8

The government called 19 witnesses in its case-in-chief who described in detail defendant Croteau's conduct related to his filing and recording numerous false, fictitious, and fraudulent tax forms and other documents.  One of the government's witnesses included IRS Special Agent Cameron Lalli.

Agent Lalli testified that when he and another agent had arrested Croteau in November 2013, Croteau had agreed to be interviewed, and he had been carrying a driver's license and identification card from the Little Tribe of the Pembina Nation indicating that he was a member of that tribe.[3]  Agent Lalli testified that one can pay to become a member of this tribe.  After Agent Lalli explained to Croteau that he was arrested for filing false tax returns, Croteau admitted that he had filed the returns but claimed that he had made a mistake and had been trying to resolve the problem with the IRS.

At trial, Croteau's defense strategy was not to contest that he had in fact filed the false, fictitious, and fraudulent tax returns and various other financial documents the government alleged, but rather to assert a good-faith defense.  In his opening statement, Croteau's counsel explained to the jury:

> There really won't be any dispute as to whether or not Mr. Croteau filed all the documents that were filed.  It's difficult if not

---

[3]The record and the parties refer to this group by a variety of names, including the "Little Tribe of the Pembina Nation," "Pembina Nation Little Shell Band of North America," "Little Pembina Nation," "Pembina Indian Nation," and "Pembina Nation."  For simplicity, we use the first of these, the "Little Tribe of the Pembina Nation."

impossible to get away from paper documents that have been filed; that's not our issue here.

Rather, his counsel explained, "Mr. Croteau had an honest belief that what he was doing was correct."

Defendant Croteau took the stand to try to explain his conduct. On cross-examination, Croteau admitted that he had signed and filed the tax returns covered by at least Counts One through Eight in the indictment. He also admitted that he had set up an account through the IRS's FIRE system and that he had filed numerous 1099-OID forms. Croteau conceded that several financial institutions had not in fact paid him interest or withheld interest income as Croteau had claimed they had, as substantiation for some of his tax returns.

Croteau testified to receiving numerous warning letters from the IRS informing him that he had filed frivolous and unlawful claims and warning of potential consequences. He also testified that he had contacted the IRS about it and was instructed to refile his taxes. Croteau admitted that he had been told that the information on which he relied in initially filing his false and frivolous tax returns—the information about submitting 1099-OID forms—was a "scam." Nevertheless, Croteau continued to file subsequent tax returns in the same manner as his initial false and fraudulent tax returns. Croteau admitted that, even after he had realized his "mistake," he had sought a $146,667 refund in his 2007 amended return. Despite knowing that the IRS viewed his OID filings as being a "scam,"

10

Croteau went ahead and submitted returns for 2009 seeking refunds based on this theory. Croteau also admitted that he recorded several documents with the Lee County Clerk's office, which alleged that others owed him millions of dollars, even naming individuals as debtors Croteau admitted he knew did not actually owe him any money.

Prior to the fall of 2008, defendant Croteau had always filed his taxes properly and without incident. He explained that up to that point, he had his accountant Barry Woodrow do his income taxes for about ten years. During that time, Woodrow filed Croteau's tax returns and Croteau regularly paid taxes to the IRS. Croteau explained that he had "perfect books" and was never audited.

For example, in February 2006, Croteau and his wife authorized Woodrow to file their 2005 joint income tax return. They claimed an adjusted gross income of $238,741, including his wife's wages ($48,469), interest ($88), business income ($4,000), capital gains ($270,462), and losses from rental real estate ($84,298). They claimed that $2,941 of their income had been withheld and that they owed $23,761 in taxes. Also, in August of 2007, Croteau authorized Woodrow to file his 2006 tax return, for which he was sent a $30 tax refund.

Defendant Croteau also testified that for 25 years, he owned and operated a welding company, which was profitable for a time, and he typically employed between four and fifteen people. But things began to unravel. By 2005, Croteau's

11

business was failing.  In 2006, Croteau was injured in an automobile accident and hospitalized for approximately two weeks.  Croteau's wife filed for divorce.

Defendant Croteau admitted that, after these events, he became involved with a tax protester and sovereign citizen group called the Little Tribe of the Pembina Nation.  This group advocated that its members did not need to submit to governmental authority or pay taxes.  At his brother Armand's prompting, Croteau began researching the theories espoused by this group.  As he read more and more, Croteau concluded that the sovereign citizen theories "made real sense" to him.  He and his brother Armand "donated" approximately $700 to join the Little Tribe of the Pembina Nation and have access to identification cards, driver's licenses, and other such materials put out by the group.  One such card explained that members were exempt from paying taxes.

Croteau also ordered CDs on the Internet from, and watched YouTube videos created by, a man named Winston Shrout, even paying $500 to attend one of Shrout's 2-day seminars.  Croteau testified that based on the information from these sources, he came to believe that he had a secret Federal Reserve bank account containing money to which he was entitled.  He also testified that he learned from Shrout that he could access his "principal money" by using "1099-OID."  He also came to believe based on these sources that the United States is a corporation and that citizens are employees of that corporation.

In addition, Croteau called two witnesses to testify on his behalf.  One was Walker Todd, an attorney and tax-preparer who had worked for the Federal Reserve Bank.  Todd discussed a number of the sovereign citizen theories, such as the idea that taxpayers can access secret accounts and the "redemption theory."  Todd explained that these theories lacked "historical basis," were "not real," and were "totally fantasy."  Todd explained that the IRS scam involving the use of 1099-OID forms emerged in the late 2000's and is considered one of the top tax scams in recent years.  Todd testified that these ideas are promulgated through the Internet, seminars, DVDs, and YouTube videos, with Winston Shrout being one of the main proponents.

Defendant Croteau's other witness was Dr. Jethro Toomer.  As a clinical and forensic psychologist, Dr. Toomer was consulted by defense counsel and asked to evaluate Croteau to assess his overall mental functioning as it related to Croteau's criminal charges.  As part of that evaluation, Dr. Toomer interviewed Croteau once and performed various tests on Croteau, including use of the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") to do the clinical interview.  Dr. Toomer concluded that Croteau suffered from mild depression, schizoid personality disorder, and delusional disorder.  Dr. Toomer opined that Croteau's delusional disorder caused him to be "very certain with regard to his opinions" and to "believe[] that his view of the world is correct."  Dr.

Toomer explained that such a disorder would cause someone like Croteau to be fixed in his beliefs in spite of evidence to the contrary.  Thus, Dr. Toomer opined that Croteau's delusional condition caused him to persist in filing frivolous tax forms and documents despite repeated warnings and instructions by the IRS and others that what he was doing was unwarranted.  Dr. Toomer testified that Croteau's response to these IRS warnings was to conclude, "[T]hat's wrong, that's not correct."  Dr. Toomer could not say, however, whether Croteau had truly believed what he had said.

On cross-examination, Dr. Toomer admitted that he had not reviewed Croteau's medical records, had not spoken to members of Croteau's family or to investigators, and had not performed neurological or neuro-psychiatric testing.  Dr. Toomer also did not recommend any further treatment for Croteau.  Dr. Toomer conceded that the DSM now instructs the examiner to take into account the person's religious and cultural background when diagnosing a person with delusional disorder.  Dr. Toomer agreed that a person is not considered delusional if his belief is derived from membership or association with a particular subculture.

The government called rebuttal witness Dr. Douglas Shadle, a board-certified psychiatrist practicing mainly in the area of forensic psychiatry, who also evaluated defendant Croteau in connection with his criminal charges.  Dr. Shadle examined Croteau's past psychological evaluations, including Dr. Toomer's and an

14

evaluation by another doctor, as well as various documents related to the criminal investigation, including materials about the Little Tribe of the Pembina Nation and the sovereign citizen movement. Dr. Shadle performed a basic psychiatric examination of Croteau and administered the Folstein Mini Mental screening test for various psychological conditions. On this test, which evaluates orientation, memory, recall, and abilities to read, write, and engage in conversation, Croteau scored 28 out of 30 points, which placed Croteau above average.

Dr. Shadle had "very little difficulty" interacting with Croteau, although Croteau was apprehensive initially. Croteau was talkative, answered questions appropriately, and displayed a suitable range of emotions, from sadness to humor. Though Dr. Shadle found that defendant Croteau had a personality disorder marked by antisocial and narcissistic behaviors as well as some mild depression, Dr. Shadle firmly disagreed with Dr. Toomer's delusional disorder diagnosis of Croteau and disagreed that Croteau had any kind of schizoid personality disorder.

In support of this opinion, Dr. Shadle first explained that unlike with the DSM-IV—the outdated psychiatric evaluation framework Dr. Toomer had used to examine Croteau—the up-to-date DSM-V evaluation framework instructs that familiarity with a person's culture or subgroup is now considered important for purposes of diagnosing delusional disorders. Dr. Shadle explained that it is possible to misdiagnose a person as having a delusional disorder if the clinician

does not take into account the subgroups or cultures with which the patient identifies. This is because when people associate with a particular culture or subgroup, "within their culture . . . within the group that they associate with, that is the way everybody proceeds." In Croteau's case, Dr. Shadle concluded that despite the perhaps "misguided" nature of some of Croteau's beliefs, nevertheless, "it was all based in reality. It wasn't a fixed delusional belief that had no relationship whatsoever to the people [Croteau] associated with or his own life history."

At the close of trial, the district court instructed the jury. The court's instructions outlined the elements of defendant Croteau's false and fraudulent tax return charges and his charge for corruptly interfering with the administration of internal revenue laws. The court also instructed the jury regarding Croteau's good-faith defense.

The jury convicted Croteau on all eleven counts. Subsequently Croteau filed a Rule 29 motion for judgment of acquittal, which the district court denied.

## C.    Sentencing

Croteau's presentence investigation report ("PSI") recommended a total offense level of 24, which factored in an intended tax loss of $3,848,991.70, under U.S.S.G. §§ 2T1.1(c)(4) and 2T4.1(J). Croteau had a criminal history score of I.

As a result, Croteau's advisory guidelines range was 51 to 63 months' imprisonment.

Croteau filed a sentencing memorandum requesting a downward variance and departure.[4] He sought a downward departure pursuant to U.S.S.G. §§ 5H1.3 and 5K2.13. He argued that he suffered from anxiety disorder, delusional disorder, and a personality disorder, as testified by Dr. Toomer, and therefore that he suffered from diminished capacity and was unable to understand the consequences of his behavior. Croteau sought a downward variance based on, inter alia, his alleged diminished capacity and the need to avoid sentence disparities among defendants found guilty of similar conduct.

At the sentencing hearing, after acknowledging the contents of the PSI, the district court concluded Croteau's guidelines range was 51 to 63 months' imprisonment. The district court then considered Croteau's arguments in favor of a downward departure or alternatively a variance. The court heard further testimony from Dr. Toomer regarding Croteau's alleged psychological conditions. Croteau's counsel also argued that Croteau should receive a downward variance so as to avoid a sentencing disparity because his brother Armand Croteau had only received a 27-month sentence for similar conduct (and had pled guilty) and had allegedly induced defendant Croteau to behave as he had. The court gave Croteau

---

[4]Croteau also filed written objections to the PSI, and the district court ruled on those objections. Croteau has not appealed any of those rulings.

an opportunity to argue how the 18 U.S.C. § 3553(a) sentencing factors should be applied in his case.

The district court explained that it had considered the testimony of both Dr. Toomer and Dr. Shadle as well as Croteau's testimony and all other evidence presented at trial. Based on that evidence, the court found that Croteau had knowingly and intentionally committed the offenses charged. The court found Croteau to be an "intelligent man" who had been able to run a business successfully for many years. The court found no basis for a downward departure.

The district court then explained that it had examined the relevant factors in Croteau's case. It had examined Dr. Toomer's testimony, Croteau's history and characteristics, and the need for Croteau's sentence to reflect the seriousness of the offense. The court found that Croteau had not accepted responsibility for his actions. As to Croteau's sentencing disparity argument, the court concluded that Armand Croteau's circumstances differed from defendant Croteau's in relevant respects. Armand had pled guilty to three counts, testified to the actions he had taken, and accepted responsibility for them.[5] The court also denied defendant Croteau's downward variance request.

---

[5]The district court said Armand had pled guilty to two counts, but the record shows Armand pled guilty to three counts (two counts of making false, fictitious, or fraudulent claims and one count of corruptly interfering with the administration of internal revenue laws).

18

The district court then sentenced defendant Croteau to 56 months' imprisonment on each of Counts One through Ten, and to 36 months' imprisonment on Count Eleven, with all sentences to run concurrently.  Croteau's sentence was within the advisory guidelines range.

## II.  SUFFICIENCY OF THE EVIDENCE

We first consider defendant Croteau's challenge to the sufficiency of the evidence supporting his convictions.

## A.    Standard of Review

As noted earlier, when reviewing a challenge to the sufficiency of the evidence supporting a conviction, we must view the evidence in the light most favorable to the Government and draw all reasonable inferences in favor of the jury's verdict.  See United States v. Lebowitz, 676 F.3d 1000, 1013 (11th Cir. 2012); United States v. Hunt, 526 F.3d 739, 744 (11th Cir. 2008).[6]  We will affirm a conviction so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Hunt, 526 F.3d at 745 (quotation marks omitted).

"It is well-established that credibility determinations are the exclusive province of the jury."  United States v. Thompson, 422 F.3d 1285, 1292 (11th Cir. 2005) (quotation marks and alterations omitted).  And, we "resolve any conflicts in

---

[6]We review de novo a challenge to the sufficiency of the evidence and a district court's denial of a Rule 29 motion.  Hunt, 526 F.3d at 744.

favor of the government" and "assume that the jury made all credibility choices in support of the verdict." Lebowitz, 676 F.3d at 1013. Accordingly, "the jury's verdict will not be disturbed on appeal unless the testimony is incredible as a matter of law." United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009) (quotation marks omitted).

Criminal defendants may not be compelled by the government to testify, see U.S. Const. amend. V, but where they choose to testify on their own behalf, they "run[] a substantial risk of bolstering the Government's case," United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004) (quotation marks omitted). This is because "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (quotation marks omitted). Such an inference, drawn from the defendant's testimony and in combination with other corroborative evidence, may be considered substantive evidence of his guilt. See United States v. Hough, 803 F.3d 1181, 1188 (11th Cir. 2015) (citing United States v. McCarrick, 294 F.3d 1286, 1293 (11th Cir. 2002)). "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements" such as knowledge or intent. Brown, 53 F.3d at 315.

And for purposes of proving mens rea, "[g]uilty knowledge can rarely be established by direct evidence, especially in respect to fraud crimes which, by their

very nature, often yield little in the way of direct proof." United States v. Suba, 132 F.3d 662, 673 (11th Cir. 1998). Therefore, mens rea elements such as knowledge or intent may be proved by circumstantial evidence. See United States v. Santos, 553 U.S. 507, 521, 128 S. Ct. 2020, 2029 (2008); Suba, 132 F.3d at 673.

## B.    Ten False Claim § 287 Convictions

To establish the false claim charges for violating 18 U.S.C. § 287, the government must prove that: (1) Croteau presented a claim against the United States to an agency or department thereof; (2) such a claim was false, fictitious, or fraudulent; and (3) Croteau knew that the claim was false, fictitious, or fraudulent. See United States v. Hesser, 800 F.3d 1310, 1320 (11th Cir. 2015) (reviewing convictions under § 287). The indictment charged that Croteau knowingly and intentionally presented ten such claims by filing income tax returns with the IRS that sought various income tax refund amounts, and that Croteau knew that his claims were false, fictitious, and fraudulent with respect to material facts.

When charging the jury, as to the first element, the district court instructed that the jury must find that Croteau "knowingly presented a false claim." The court explained that the word "knowingly" means "that an act was done voluntarily and intentionally and not because of a mistake or by accident." As to the second element, the court instructed that the jury must find that the "claim was based on a false or fraudulent material fact." As to the third element, the court instructed that

21

a "claim is false or fraudulent if it is untrue when made or presented and the person making or presenting it knows it is untrue." The court added that "the government does not have to show that the governmental department or agency was, in fact, deceived or misled."

Here the government presented ample evidence to support Croteau's ten § 287 convictions. The government elicited testimony from 19 witnesses including IRS officials and investigators. These witnesses explained in detail how and why Croteau's tax returns were false and fraudulent, and their testimony established that Croteau had indeed filed these returns. Croteau's own testimony also largely corroborated the government witnesses' assertions about his conduct, generally admitting that he had in fact filed the returns. And Croteau does not challenge the conclusion that his false tax returns concerned material facts. Croteau's principal defense concerned the third element: that he lacked mens rea because he did not know the tax returns he filed were false, fictitious, or fraudulent.

In this case, the evidence sufficiently proved that defendant Croteau knew the tax returns he filed with the IRS were false, fictitious, or fraudulent. For years, with the help of his accountant Barry Woodrow, Croteau had properly filed his taxes without incident. Specifically, in August 2007 Croteau authorized Woodrow to file his 2006 tax return, for which he was sent a $30 tax refund. Croteau then began filing his tax returns on his own based on theories espoused by the tax-

protesting sovereign citizen group that he had joined.  The method Croteau used was inconsistent with how he had always filed his taxes before.  Croteau admitted that after using his new methods, he was warned numerous times by the IRS that he had submitted frivolous tax returns and that he needed to correct these returns.  Those warnings stated that there was "no basis in the law" for the manner in which Croteau had filed his returns and that Croteau's "information reflect[ed] a desire to delay or impede the administration of Federal tax laws."

Despite these warnings, Croteau persisted in filing false, fictitious, and fraudulent tax returns in the same manner.  Croteau also admitted he had lost his business and his marriage, from which the jury could reasonably infer that Croteau needed money.  The jury readily could have concluded from the evidence that defendant Croteau knew what was required of him in filing his tax returns; he simply disregarded the law by trying to use a tax protester scheme.  The jury was also free to disbelieve Croteau's testimony to the effect that he did not know the tax returns he filed were false and instead "conclude the opposite of his testimony is true."  See Brown, 53 F.3d at 314 (quotation marks omitted).  The jury was entitled to reject Croteau's narrative.

Defendant Croteau also argues that the government failed to prove criminal intent because none of the government's witnesses could testify about his knowledge or intent.  For example, Croteau points out that one such witness, called

23

to testify about false and fraudulent financial instruments, conceded that the fact that someone submits a fictitious document to a government entity does not itself reveal why someone would do so or whether they had a valid reason to do so.

But the government was not required to prove motive—it was simply required to prove knowledge of falsity—and in doing so it was allowed to rely on circumstantial evidence in establishing knowledge. See Suba, 132 F.3d at 673. It amply did so. The government also was not required to prove that Croteau acted with specific intent to violate the law or with specific intent to commit a crime to prove violations of § 287. See Hesser, 800 F.3d at 1320 n.16 (explicitly concluding that § 287 does not contain any specific intent element).

The jury was also free to disbelieve the testimony of Croteau's expert witness, Dr. Toomer, who opined that Croteau suffered from a delusional disorder. Based on the government's cross-examination of Dr. Toomer, the jury reasonably could have concluded that Dr. Toomer's evaluation of Croteau was not thorough to their satisfaction or even believable. The jury also reasonably could have concluded that, in assessing whether Croteau was genuinely delusional, Dr. Toomer had not adequately taken into account Croteau's association with the tax-protesting Pembina Nation group. That is because, if Croteau's behavior was fully consistent with beliefs perpetuated by the Little Tribe of the Pembina Nation, his association with that group undercuts the suggestion that Croteau's behavior was

due to a genuine psychological condition.  And in a battle of the experts, the jury was free to believe the government's expert witness, Dr. Shadle, that Croteau was not delusional and reject Dr. Toomer's testimony that Croteau was.

Both parties agree that good faith is a defense to charged violations of § 287. Defendant Croteau argues that "a good faith belief that the tax laws [have] been satisfied, even if the belief is not reasonable," is a complete defense to false tax return crimes.  The government does not contest Croteau's assertion.  We note, however, that it is not clear whether good faith is a defense to a § 287 violation because all of the cases the parties cite involve not only different tax statutes but also statutes where "willfulness" or "specific intent" was an element of the charged crime.  See Cheek v. United States, 498 U.S. 192, 193, 199-201, 111 S. Ct. 604, 606, 609-10 (1991) (construing 26 U.S.C. § 7201, which requires proof of willfulness, and indicating that where willfulness is an element, a defendant's asserted good faith belief that he has complied with the tax laws—even if unreasonable—if believed by the jury, is a defense); United States v. Morris, 20 F.3d 1111, 1115 (11th Cir. 1994) (construing 26 U.S.C. § 7206(1), which requires proof of specific intent or willfulness, and recognizing good faith to be a viable defense to such a charged crime).

Even assuming arguendo that a good faith defense were applicable in the context of § 287 violations, defendant Croteau has not shown that no reasonable

25

jury could have failed to find that he had established that defense. Indeed, as outlined above, the evidence abundantly showed Croteau did not act in good faith. Furthermore, the decisions Croteau cites are cases where courts reversed a conviction and remanded on the basis that the defendant was denied a proper good faith jury instruction to which he was entitled. Cheek, 498 U.S. at 203-04, 207, 111 S. Ct. at 611-13; Morris, 20 F.3d at 1115-18; United States v. Heller, 830 F.2d 150, 154-56 (11th Cir. 1987). In contrast here, the district court gave a good faith jury instruction for all of Croteau's charged crimes. In convicting Croteau, the jury was free to disbelieve his testimony. See Williams, 390 F.3d at 1325. In sum, the evidence was more than sufficient to support Croteau's § 287 convictions.

## C.    Corruptly Interfering § 7212(a) Conviction

To establish the corruptly interfering charge for violating 26 U.S.C. § 7212(a), the government must prove that Croteau "corruptly . . . obstruct[ed] or impede[d], or endeavor[ed] to obstruct or impede, the due administration of" the internal revenue laws. 26 U.S.C. § 7212(a). The indictment charged in Count Eleven that Croteau did so through various means including by filing false income tax returns and by filing and submitting other false and fictitious documents and instruments with various government entities.

When charging the jury, the district court instructed that the jury must find Croteau (1) "knowingly tried to obstruct or impede the due administration of the

26

internal revenue laws," and (2) "did so corruptly." The court explained to the jury that "[t]o act corruptly means to act knowingly and dishonestly for a wrongful purpose." The court further explained that "[t]o try to obstruct or impede is to consciously attempt to act or take some step to hinder, prevent, delay, or make more difficult the proper administration of the internal revenue laws."

This Court has held that to act corruptly includes "all activities that seek to thwart the efforts of government officers and employees in executing the laws enacted by Congress." United States v. Popkin, 943 F.2d 1535, 1540 (11th Cir. 1991). When proving violations of § 7212(a), the government is not required to prove that the administration of the internal revenue laws was actually obstructed or impeded, but only that the defendant corruptly attempted to do so. See 26 U.S.C. § 7212(a); Popkin, 943 F.2d at 1535. And here, since the indictment alleged alternative means by which Croteau violated § 7212(a), we need only find that sufficient evidence supported the jury's verdict as to any one of those means. See United States v. Mozie, 752 F.3d 1271, 1283-84 (11th Cir. 2014).

We easily conclude that the government presented sufficient evidence to support Croteau's conviction as to this § 7212(a) crime as well. As we have discussed, the government presented ample evidence that Croteau filed at least ten frivolous tax returns with the IRS during a two-year stretch, several of which contained false, fictitious, and fraudulent information. Croteau submitted these

27

forms, and documents purportedly substantiating these tax returns such as the 1099-OID forms, both via mail and electronically. Croteau was warned multiple times by the IRS that his submissions reflected "a desire to delay or impede the administration of Federal tax laws." But Croteau kept submitting false and fraudulent tax returns in the same manner anyway. Croteau also submitted false, fictitious, and fraudulent instruments to the U.S. Treasury Department and recorded multiple false, fictitious, and fraudulent documents with the Lee County Clerk's office, all alternative means of violating § 7212(a). Given Croteau's affiliations with the tax-protester group the Little Tribe of the Pembina Nation, a jury could have readily and reasonably concluded that Croteau knowingly and corruptly tried to obstruct or impede the due administration of the internal revenue laws.

We reject defendant Croteau's argument that the government was required to offer explanations for why Croteau would submit the various false, fictitious, and fraudulent documents that he did. It is enough that Croteau tried to obstruct or impede the IRS or other government entities. His motive for doing so is not relevant.

We also disagree that in assessing whether Croteau acted corruptly, our sufficiency analysis must take into account whether the numerous documents Croteau submitted were obviously fictitious or fraudulent. Croteau points to the

28

testimony of one government witness who explained that it was apparent that Croteau's fictitious financial instruments filed with the U.S. Treasury Department were "nonsense." But § 7212(a) criminalizes attempts to obstruct or impede; there is no requirement that Croteau succeed in obstructing or impeding. See 26 U.S.C. § 7212(a); Popkin, 943 F.2d at 1535. That same government witness also testified that Croteau's false, fictitious, and fraudulent financial instruments nevertheless exhibited "indicia or hallmarks . . . intended to make [them] appear genuine." From this fact, among other evidence, a jury reasonably could have concluded that Croteau acted with the necessary criminal intent.

And as we have previously explained, the jury was free to reject Dr. Toomer's theory, that an alleged delusional disorder prevented Croteau from acting with the necessary criminal intent. Simply put, the evidence was more than adequate to support Croteau's conviction for violating § 7212(a) as well.

### III.  SENTENCING

Croteau also challenges the procedural and substantive reasonableness of his sentence. He argues that the district court abused its discretion in denying his motion for a downward departure under U.S.S.G. § 5K2.13 and § 5H1.3 or alternatively a variance.

29

## A.    General Reasonableness Principles

In reviewing the reasonableness of a sentence, we first ensure that the district court committed no significant procedural error.  Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).  We then examine whether the sentence was substantively reasonable in light of the totality of the circumstances.  Id.  The party challenging the sentence bears the burden to show that the sentence imposed is unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors.  United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).

As to the first step, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."  Gall, 552 U.S. at 51, 128 S. Ct. at 597.

As to the second step—assessing substantive reasonableness—the district court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public.  See 18 U.S.C. § 3553(a)(2).  The district court must also consider the nature and circumstances of

the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1), (3)-(7).

The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007). Moreover, the district court has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of such a variance. United States v. Cubero, 754 F.3d 888, 892 (11th Cir.), cert. denied, 135 S. Ct. 764 (2014). We will not remand for resentencing unless we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case. United States v. Irey, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc).

We do not presume that a sentence falling within the guidelines range is reasonable, but we ordinarily expect it to be so. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008). A sentence imposed well below the statutory maximum penalty is another indicator of reasonableness. See United States v. Gonzales, 550 F.3d 1319, 1324 (11th Cir. 2008).

The district court is required "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, defendants who cooperate with the government and enter written plea agreements are not similarly situated to a defendant who provides no assistance and proceeds to trial. United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009).

Finally, we lack jurisdiction to review a district court's discretionary refusal to grant a downward departure unless the district court incorrectly believed that it lacked the authority to depart from the guidelines range. United States v. Dudley, 463 F.3d 1221, 1228 (11th Cir. 2006).

**B.    Analysis**

As an initial matter, the record shows that the district court fully understood its authority to grant the downward departure that Croteau requested. The court listened to the parties' arguments for and against the departure and heard testimony in support of the departure before denying Croteau's request for a downward departure. Thus, we lack jurisdiction to review the district court's denial of Croteau's downward departure request. Id.

Defendant Croteau has not demonstrated that his sentence was procedurally or substantively unreasonable.[7] The district court heard testimony, explained its sentence, and noted that it considered the PSI, filings by counsel, and the § 3553(a) factors. See Gall, 552 U.S. at 51, 128 S. Ct. at 597.

The district court more than adequately explained its sentence and did not abuse its discretion in declining to grant a downward variance. Croteau argues that the "testimony of Dr. Toomer alone supports the granting of a variance" to Croteau's sentence. Although Croteau contends that the district court did not adequately consider Dr. Toomer's testimony, the record shows that the court acknowledged Dr. Toomer's testimony along with testimony by Dr. Shadle, Croteau himself, and other evidence presented at trial. The district court was not required to believe Dr. Toomer's testimony. The court also considered Croteau's history and characteristics. It was well within the court's discretion to conclude that Croteau committed the charged offenses, and the weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. Clay, 483 F.3d at 743.

Moreover, Croteau's sentence was within the advisory guidelines range, and we normally expect a sentence falling within the guidelines range to be reasonable. Hunt, 526 F.3d at 746. Further, if the penalty for all charged crimes are combined,

---

[7]Croteau does not challenge the district court's calculation of his advisory guidelines range.

the sentence was also well below the total statutory maximum of 53 years, another indicator of reasonableness.  Gonzales, 550 F.3d at 1324.  We recognize that Armand Croteau was sentenced to 27 months.  But there was no unwarranted sentencing disparity between Croteau and his brother Armand, as his brother accepted responsibility and was convicted on three counts, whereas Croteau was convicted on eleven counts.  See Docampo, 573 F.3d at 1101.

For all these reasons, we affirm Croteau's convictions and sentence.

**AFFIRMED.**