[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-11023

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANGELO DEVON WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:23-cr-00008-HL-TQL-1

_____

Before JORDAN, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Angelo Williams appeals his conviction and 51-month sentence for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). On appeal, he challenges the sufficiency of the evidence to support his conviction as well as the reasonableness of his sentence. After careful consideration, we affirm.

## I.

This case arises out of a police investigation into a domestic violence incident involving Williams and his former girlfriend, Donna King. During the investigation, officers found a gun that they traced to Williams, a convicted felon. In this section, we describe the incident and then review the procedural history of Williams's criminal case.

### A.

The following facts are taken from the evidence introduced at Williams's criminal trial. Williams, who worked at a Home Depot distribution center in Lake Park, Georgia, became friends with King, one of his coworkers. When Williams needed a place to live, King invited him to move into her house. While living together, the two began a romantic relationship.

Before moving in, Williams asked King whether he could bring a gun to the house. King, whose children lived in the house, refused. Williams told her that he would see if he could leave the gun with the person who sold it to him, one of their coworkers at

24-11023              Opinion of the Court                3

the distribution center. During the time they lived together, King never saw Williams with a gun.

After about two months, the couple's romantic relationship ended when King learned that Williams was talking to other women. Around this time, King was driving a rental car because her car was in the shop being repaired.

One evening in July 2020, King returned home after driving the rental car for the rideshare service Lyft. When she returned home, Williams had packed up all his belongings; he told her that he was moving out. He then entered King's bedroom, grabbed the keys for the rental car, and said he was going to take the car. King told Williams that he could not drive the car and demanded the keys back. As the two argued, Joshua, King's ten-year-old son, entered the bedroom and told Williams to give his mother the keys. Williams called Joshua a racial epithet and refused to return the keys.

King and Joshua ran outside to the car, which was parked in the driveway. King sat in the driver's seat and Joshua in the front passenger seat. They locked the car from the inside. Williams used the keys to unlock the car and then loaded his belongings into the backseat and trunk.

King would not let Williams take the car, which she needed to return to the rental car company the next morning. She offered to drive Williams wherever he wanted. Williams finished loading his belongings into the backseat and trunk, forced open the driver's side door, and shoved King to the passenger side. He also took her

phone. She told Joshua to move to the backseat. Joshua sat behind the passenger seat; Williams's belongings were behind the driver's seat.

With King and Joshua in the car, Williams pulled the car out of the driveway and drove up the street. He then made a U-turn and parked the car back in the driveway. He ordered King out of the vehicle, threatening that if she did not get out of the car, he would "beat [her] ass." Doc. 62 at 99.[1] King refused to leave. She reached over and snatched the keys out of the ignition. Williams hit her in the head and on the face.

When Williams hit King, Joshua ran from the car to a neighbor's house for help. At the same time, King reached across the steering wheel and laid on the horn to get her neighbors' attention. Joshua asked his neighbors for help, and they called the police. By the time Joshua returned with the neighbors, Williams had pulled King out of the car and onto the ground. When the neighbors told Williams that they had called the police, he ran away.

Approximately ten minutes later, around 11:30 pm, Valdosta police officer Taylor Parr and another officer arrived on the scene. King told them that she had argued with Williams about the car and then he beat her up and ran away. Parr saw that she had multiple scrapes and bruises as well as swelling on her forehead. He conducted a protective sweep of the front yard. He approached the passenger side of the car, which had both doors open. When he

---

[1] "Doc." numbers refer to the district court's docket entries.

shined his flashlight into the car, he saw two suitcases resting on the backseat behind the driver's seat; underneath the suitcases, he spotted the barrel of a gun.

After Parr spotted the weapon, the officers continued to speak with King about the incident with Williams. Parr asked whose items were in the car; she answered that they belonged to Williams. Parr asked King if Williams had a gun. She responded, "No, not that I know of." *Id.* at 102. He then asked whether she knew there was a gun in the backseat of the car; she answered no. Parr took the weapon from the car for safekeeping. He did not remove any other items from the car.

**B.**

After this incident, a federal grand jury charged Williams with possessing a firearm as a convicted felon. He pleaded not guilty.

The case proceeded to trial. The primary issue at trial was whether Williams knowingly possessed the firearm found in the car.[2] The government's witnesses included King, Parr, and Curt Hayden, a former Home Depot distribution center employee. One of the government's exhibits at trial was the gun that Williams allegedly unlawfully possessed.

---

[2] Williams stipulated that he had previously been convicted of a felony and that he knew his status as a convicted felon. And at trial, the government introduced unrebutted evidence that the gun was manufactured in Serbia and had moved in interstate commerce.

King testified about the incident with Williams and how, when officers came to investigate, they found a gun in the backseat of the rental car. She told the jury that when she returned home that night after driving for Lyft, the backseat of the rental car was empty. She stated that she was certain of this because she could not have anything in the backseat while driving passengers for Lyft. She admitted that she had not seen Williams with a gun that night, but she also told the jury that the gun found in the car did not belong to her or Joshua.

In his testimony, Parr described responding to the call at King's house and finding a gun in the car. He was shown the gun that was the government's trial exhibit and identified it as the one from the car.

Hayden, the former Home Depot distribution center employee, testified about selling a gun to a coworker. He was a gun enthusiast who owned an AK-47, which he had legally purchased. After purchasing the gun, he added a foregrip, a red dot sight, and a picatinny rail to it. He ultimately did not like the AK-47 and sold it. He testified that in 2017, he sold it to one of his Home Depot coworkers for approximately $600. He identified the gun that was the trial exhibit as the one he sold to his coworker.

Hayden was asked at trial about the purchaser of the gun. He testified that he created a bill of sale for the transaction that identified the purchaser of the weapon and kept the document in his storage unit. But the storage unit was destroyed in a hurricane, and he no longer had the bill of sale.

Hayden testified that shortly before the trial, which occurred approximately six years after he sold the gun, an agent from the Federal Bureau of Investigation contacted him, asking about the gun. Hayden could not remember the purchaser's full name. He told the agent that he had sold it to a coworker named either D'Angelo or Angelo and mentioned that he had coworkers at Home Depot named both D'Angelo and Angelo. He described the purchaser as a "darker-skinned African-American" man with a medium build. *Id.* at 73.

After meeting with the agent, Hayden thought more about the gun sale and spoke to his brother who had worked with him at the Home Depot distribution center. After this conversation, Hayden was certain that he sold the weapon to Angelo, not D'Angelo. Hayden explained that D'Angelo was a lighter-skinned African American man with tattoos.

In addition to these three witnesses, the government also called Michael Cartrett, a crime scene technician, to testify. He inspected the gun in this case but found no fingerprints with enough detail or clarity to warrant further examination.

After the government rested, Williams did not call any witnesses or present any evidence. He did not move for a judgment of acquittal. The jury returned a guilty verdict.

## C.

Before sentencing, a probation officer prepared a presentence investigation report ("PSR"). The PSR assigned Williams a total offense level of 20 and a criminal history score of four.

The PSR described Williams's criminal history. In 2006, when he was 18, Williams committed a robbery and carjacking. In Florida state court, he had adjudication withheld and was placed on community control—that is, house arrest—followed by a term of probation.[3] The PSR reported that he repeatedly violated the terms of his community control. On one occasion, after leaving his home without permission, Williams was pulled over in a traffic stop and fled from police. The state court then required him to wear a GPS ankle monitor. But he tampered with the monitor and also tested positive for cocaine. After Williams's repeated violations, the state court adjudicated him guilty of the robbery and carjacking offenses and imposed a sentence of approximately 120 days. The PSR assigned this sentence three criminal history points.

In 2018, Williams led police on a high-speed chase. In state court, he pleaded guilty to fleeing from police. He received a 15-year sentence and was directed to serve 19 days in custody and the

---

[3] Under Florida law, when a court finds that the "defendant is not likely again to engage in a criminal course of conduct and that the ends of justice . . . do not require that the defendant presently suffer the penalty imposed by law," the court has discretion to "withhold the adjudication of guilt" and place the defendant on probation or community control. Fla. Stat. § 948.01(2)–(3); *see Robinson v. State*, 278 So. 3d 76, 79 (Fla. Dist. Ct. App. 2019). If the defendant violates the terms of his probation or community control, the court "may then adjudicate and sentence." *Thomas v. State*, 356 So. 2d 846, 847 (Fla. Dist. Ct. App. 1978).

remainder on probation. The PSR assigned this sentence one criminal history point.[4]

The PSR noted that on several other occasions Williams had been charged with other crimes. Between 2006 and 2016, he was charged in Florida with grand theft of a vehicle, possession of cocaine, possession of a firearm as a convicted felon, and aggravated assault with a firearm. The PSR reported that in each case the State declined to prosecute for unknown reasons. After the incident when Williams beat King, he was charged in Georgia state court with battery and possession of a firearm by a convicted felon. But the State dropped these charges after he was indicted in federal court. The PSR did not assign any criminal history points to these incidents because they did not result in any conviction or sentence.

Because Williams had a total of four criminal history points, the PSR assigned him to criminal history category III. Given his total offense level and criminal history category, the PSR calculated his guidelines range as 41 to 51 months' imprisonment.

At sentencing, the district court adopted the PSR's guidelines calculation. Williams asked the district court either to grant a downward variance or to impose a sentence at the bottom of the guidelines range. He asked the court to focus on his history and

---

[4] Williams unlawfully possessed the firearm in this case while on probation. The PSR did not assign Williams any additional criminal history points for committing the firearm offense while under a criminal justice sentence because he had fewer than seven criminal history points. *See* U.S. Sent'g Guidelines Manual § 4A1.1(e).

characteristics. In high school, Williams was an accomplished athlete who was offered a college scholarship to play football. But he began hanging out with the wrong crowd and was arrested for carjacking. He then failed to graduate high school and lost the football scholarship. After his arrest and the death of his mother a few years later, Williams struggled to get his life back on track. He asked the court to consider that he had turned his life around. He had a supportive family, was a loving and devoted father, and maintained steady employment. He also pointed out that while on bond in this case he had not gotten into any trouble.

Williams's niece and girlfriend addressed the court. They spoke about how he had changed and was devoted to caring for his children, helping others, and practicing his religion. Williams also addressed the court, stating that he had made mistakes and was not proud of his past. He told the court that he had changed and was focused on caring for his children, helping the less fortunate, and practicing his religion. He apologized to the court.

The government asked the court to impose a sentence above the guidelines range. It argued that several of the sentencing factors set forth at 18 U.S.C. § 3553(a),[5] including the seriousness of

---

[5] Under § 3553(a), a district court is required to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of the statute. 18 U.S.C. § 3553(a). These purposes include the need to: reflect the seriousness of the offense; promote respect for the law; provide just punishment; deter criminal conduct; protect the public from the defendant's future criminal conduct; and effectively provide the defendant with educational or

24-11023                Opinion of the Court                11

the offense and need to promote respect for the law, supported an upward variance. It pointed out that Williams had beaten King in the face, terrorized her and Joshua, possessed a firearm while knowing that he was not permitted to do so, and then fled from law enforcement. The government also argued that the guidelines range underrepresented Williams's criminal history. It noted that the offenses he had previously committed included carjacking, robbery, and fleeing the police. The government argued that even if Williams had recently changed, he still needed to be held accountable for his criminal conduct in this case.

After considering the parties' arguments, the applicable guidelines range, the § 3553(a) factors, and the facts of the case, the court imposed a sentence of 51 months' imprisonment followed by a three-year term of supervised release. Although the government made "a compelling case for an upward variance," the court concluded that there were "some mitigating circumstances" and determined that "a guideline sentence [was] appropriate." Doc. 63 at 17. Williams objected to the reasonableness of the sentence.

This is Williams's appeal.

---

vocational training, medical care, or other correctional treatment. *Id.* § 3553(a)(2). The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. *Id.* § 3553(a)(1), (3)–(7).

## II.

On appeal, Williams challenges his conviction, arguing that there was insufficient evidence to support a finding that he possessed the firearm found in King's vehicle. He also challenges the procedural and substantive reasonableness of his sentence. We start by considering Williams's challenge to his conviction and then to his sentence.

## A.

Federal law bars individuals with felony convictions from possessing firearms. *See* 18 U.S.C. § 922(g)(1). To convict a defendant of possessing a firearm as a felon, the government must prove, among other things, that the defendant was in possession of a firearm. *See United States v. Ochoa*, 941 F.3d 1074, 1104 (11th Cir. 2019). The government may satisfy this requirement by showing that the defendant had "physical possession" of the firearm. *United States v. Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996).

On appeal, Williams challenges the sufficiency of the government's evidence that he possessed a firearm. Ordinarily, we review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012). But Williams failed to challenge the sufficiency of the evidence below. Accordingly, we may reverse his conviction only if we conclude that the "record is devoid of evidence" that he possessed the firearm or the evidence of his possession "is so tenuous that a

conviction would be shocking." *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) (internal quotation marks omitted).

Williams argues that there was insufficient evidence that he physically possessed the firearm because "[n]o witness testified that [] they saw [him] with the firearm." Appellant's Br. 16. True, there was no testimony from a witness who saw him possess the firearm. But the government could rely on circumstantial evidence to prove that he possessed it. *See United States v. Howard*, 742 F.3d 1334, 1341 (11th Cir. 2014).

We conclude that the evidence presented in this case, when viewed in the light most favorable to the government, supported an inference that Williams actually possessed the gun. King testified that when she returned home from driving for Lyft the backseat of the rental car was empty, and Williams then loaded his belongings into the backseat. Approximately 15 minutes later, Parr found the gun in the backseat of the car under Williams's suitcases. And the jury heard from King that the gun did not belong to her or her young son Joshua. Taken together, this evidence supports an inference that Williams physically possessed the gun and placed it in the backseat.

On top of that, there was other evidence tying Williams to the gun. Hayden identified the gun found in the backseat of the car as the one that he had previously sold to a coworker at the Home Depot distribution center named Angelo, which was where Williams, whose first name is Angelo, had worked. And Williams also

told King before moving in that he had a gun that he had purchased from one of their coworkers.

Given the circumstantial evidence of actual possession, we cannot say that the record is "devoid of evidence of an essential element of the crime" or that the evidence of possession is so "tenuous that a conviction would be shocking." *Fries*, 725 F.3d at 1291 (internal quotation marks omitted). Accordingly, we affirm Williams's conviction.

**B.**

Williams also attacks his sentence, arguing that it is procedurally and substantively unreasonable. "We review the reasonableness of a sentence for abuse of discretion using a two-step process." *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). "We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively reasonable under the totality of the circumstances." *Id.* "The party challenging the sentence bears the burden to show it is unreasonable . . . ." *Id.*

When a defendant raises a challenge to the procedural reasonableness of his sentence for the first time on appeal, we review for plain error only. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). To establish plain error, a defendant must demonstrate that: (1) the district court erred; (2) the error was "plain"; (3) "the error affected his substantial rights"; and (4) "the error seriously affected the fairness, integrity, or public reputation of

24-11023                Opinion of the Court                15

judicial proceedings." *Id.* (alterations adopted) (internal quotation marks omitted).

### 1.

Williams challenges the procedural reasonableness of his sentence, arguing that the district court failed to adequately explain the chosen sentence. Because he did not raise this issue below, we review only for plain error.

When a district court imposes a sentence, it must "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). A sentence is procedurally unreasonable if the district court "fail[s] to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). Whether a district court's explanation was adequate "necessarily depends 'upon the circumstances of the particular case.'" *United States v. Steiger*, 99 F.4th 1316, 1321 (11th Cir. 2024) (en banc) (quoting *Chavez-Mesa v. United States*, 585 U.S. 109, 116 (2018)). "In 'conceptually simple' cases in which 'the record makes clear that the sentencing judge considered the evidence and arguments,' a district court's statement that a within-guidelines sentence is 'appropriate' can be sufficient." *Id.* at 1321–22 (quoting *Rita v. United States*, 551 U.S. 335, 358–59 (2007). When a case involves a "'major'" variance from the guidelines range, the district court must "identify a 'more significant justification' at the hearing." *Id.* at 1322 (quoting *Gall*, 552 U.S. at 50). We have explained that the requirement that a district court adequately explain its sentence "isn't onerous." *Id.*

We conclude that Williams failed to carry his burden to show that the district court committed any error, let alone plain error, in announcing his sentence. At the sentencing hearing, the district court expressly adopted the PSR's calculation that Williams's guidelines range was 41 to 51 months. Williams then argued that certain factors—particularly his history and characteristics—supported a downward variance, and the government argued that other factors—particularly, the seriousness of the offense and the need to promote respect for the law—supported an upward variance. After considering the parties' arguments, the § 3553(a) factors, and the facts of this case, the court found "compelling" reasons for an upward variance but also noted that there were "mitigating circumstances" and imposed a sentence within the guidelines range. Doc. 63 at 17. Although the court's statements were relatively brief, we can discern that "the sentencing judge considered the [appropriate] evidence and arguments" and thus conclude that the court adequately explained the chosen sentence. *Steiger*, 99 F.4th at 1321–22 (internal quotation marks omitted). The sentence thus was not procedurally unreasonable.

**2.**

We next turn to Williams's challenge to the substantive reasonableness of his sentence. He argues that in imposing a 51-month sentence the district court failed to give sufficient weight to the evidence of his rehabilitation.

We will reverse a sentence for substantive unreasonableness "only if[] we are left with the definite and firm conviction that the

district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (internal quotation marks omitted). Importantly, "[t]he weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court." *United States v. Croteau*, 819 F.3d 1293, 1310 (11th Cir. 2016). In addition, although there is no presumption of reasonableness, "[w]e ordinarily expect that a sentence falling within the guideline range will be reasonable, and a sentence imposed well below the statutory maximum penalty indicates reasonableness." *United States v. Woodson*, 30 F.4th 1295, 1308 (11th Cir. 2022) (internal quotation marks omitted).

After considering the facts of this case, we are not left with a definite and firm conviction that the district court committed an error of judgment when it imposed a 51-month sentence. Although Williams argues that the court should have granted a downward variance, we cannot say that the district court abused its considerable discretion when it weighed the § 3553(a) factors and imposed a sentence without a variance. Indeed, that the sentence was within the advisory guidelines range and well below the statutory maximum for his offenses further supports the conclusion that the sentence was reasonable. *See Woodson*, 30 F.4th at 1308. Accordingly, we affirm.

**AFFIRMED.**