[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-16641

_____

D. C. Docket No. 06-00040-CR-KD

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 5, 2008
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JASON HARDY HUNT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(May 5, 2008)**

Before BLACK and CARNES, Circuit Judges, and RESTANI[*], Judge.

BLACK, Circuit Judge:

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Chief Judge,
sitting by designation.

Following a jury trial, Jason Hardy Hunt was convicted under 18 U.S.C. § 1519 for knowingly making a false entry into a police incident report with the intent to impede, obstruct, or influence an FBI investigation. Hunt raises three issues on appeal. First, he says § 1519 is constitutionally wanting because it did not put him on fair notice his behavior was proscribed. Second, he asserts the evidence was insufficient to convict him. Third, he says his ten-month sentence is unreasonable. Each of these arguments fail; therefore, we affirm his conviction and sentence.

## I.  BACKGROUND

The following facts were adduced at trial and are substantially undisputed. On March 22, 2005, officers from the Prichard, Alabama police department were patrolling a neighborhood known for drug activity. Hunt, at that time a detective in the narcotics unit, joined other officers on patrol that evening. The officers observed James Woodard engaging in suspicious activity and stopped him to question him.

Woodard became agitated and resisted the officers' attempt to detain him. Officer Waite handcuffed Woodard and brought him over to a car where Hunt and other officers awaited. The officers searched Woodard and checked for any outstanding warrants. Finding nothing, they released him.

Woodard remained agitated and berated the group of officers, which now included Hunt, Jonathan Waite, Walter Knight, and George Lyons. He cursed them and threatened them. The officers responded. Hot words were exchanged, with Hunt in particular arguing with Woodard. After Knight tried to defuse the situation, Woodard persisted in yelling at the officers, focusing specifically on Hunt. Knight then ordered Woodard arrested.

Hunt and Waite moved towards Woodard to place him under arrest. Hunt reached him first. He grabbed Woodard, placed him in a bearhug, and threw him to the ground. Woodard's head hit the concrete, and he required medical attention as a result. Other officers administered first aid to Woodard and summoned an ambulance. Woodard was hospitalized for eight days and suffered permanent hearing loss from the incident.

The night of Woodard's arrest, Hunt returned to the station with Knight and filled out a use of force report. In the report, Hunt made the following statement: "when I (Det. Hunt) got between 2-3 feet to him (Mr. Woodard) he grabbed me (Det. Hunt) and tried to slam me, but I (Det. Hunt) was strong enough to get my hands free around his and take him (Mr. Woodard) to the ground."

The FBI launched an investigation into the circumstances surrounding Woddard's arrest. On February 8, 2006, Hunt met with FBI Agent George Glaser

3

to discuss his conduct during the arrest. At the meeting, Hunt reiterated the statement made in his original report – that Woodard grabbed Hunt first, wrapping his arms around his waist near his weapon. According to Hunt, he grabbed Woodard in an attempt to defend himself.

Two days later, Glaser again met with Hunt. Glaser had interviewed others present at the March 22 incident and found a number of inconsistencies between their recollections and Hunt's version of events. During the meeting, Hunt admitted his statement in the police report – and his statement two days prior – was inaccurate. Woodard had not initiated contact; Hunt grabbed Woodard first by wrapping his arms around his waist and pinning his arms to his side.

Ultimately, a grand jury indicted Hunt on several counts related to his conduct on March 22, including the § 1519 charge for knowingly making a false statement in his police report with the intent to impede a federal investigation. At trial, the Government presented evidence that Hunt (while undergoing training) had attended a civil rights course, where he learned the federal government would investigate and prosecute civil rights violations such as willful uses of excessive force. Glaser also testified. He noted Hunt stuck to his original version of events during the February 8 meeting and only changed his story after Glaser confronted Hunt with inconsistencies during the February 10 meeting.

4

Hunt testified in his own defense. He conceded the statement in the report was false: Woodard had not grabbed Hunt first; rather, Hunt was the first to make the move on Woodard. Hunt testified that, when he filled out the report following the incident, he was still in the "heat of the moment" and simply made an error. He said the falsity in the report was not an intentional lie.

Knight also testified to a conversation he and Hunt had together while traveling back to the police station after Hunt's takedown of Woodard but before Hunt filed the report. Knight said Hunt told him Woodard had grabbed him first and asked if he had done anything wrong. Knight responded by saying that, if Woodard indeed had grabbed him first, then Hunt's behavior was appropriate.

A jury convicted Hunt of the § 1519 charge. At sentencing, the judge noted the calculated guidelines range was 10 to 16 months. The judge found Hunt's behavior was aberrant, but also recognized deterrence was an important factor in the case. In light of this, the judge sentenced Hunt to five months' imprisonment followed by five months' home confinement. This appeal followed.

## II. DISCUSSION

*A. Due Process Challenge*

Hunt argues application of § 1519 in this context deprived him of due process because his conduct is not the type contemplated by Congress when it

5

passed the statute and, therefore, he was not placed on fair notice that his conduct was criminal. We review such a constitutional challenge de novo. *United States v. Knight*, 490 F.3d 1268, 1270 (11th Cir. 2007).

The Fifth Amendment's Due Process Clause harbors within its scope the notion of fair warning: a statute cannot be enforced "if it is so vague that 'men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Mena*, 863 F.2d 1522, 1527 (11th Cir. 1989) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127 (1926)). Put another way, the statute must be sufficiently clear to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Bama Tomato Co. v. U.S. Dept. of Agriculture*, 112 F.3d 1542, 1547 (11th Cir. 1997) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298-99 (1972)). The touchstone of the inquiry is the meaning of the statute in light of common understanding and practice. *Mena*, 863 F.2d at 1527.

The question of fair warning must begin with the language of the statute itself. Section 1519 states as follows:

> Whoever *knowingly* alters, destroys, mutilates, conceals, covers up, falsifies, or *makes a false entry* in any record, document, or tangible object *with the intent to impede, obstruct, or influence* the

6

investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . , or in relation to or contemplation of any such matter or case, shall be [in violation of this statute].

18 U.S.C. § 1519 (emphasis added). Nothing here suggests the statute is, in the context before us, vague. This statute rather plainly criminalizes the conduct of an individual who (1) knowingly (2) makes a false entry in a record or document (3) with intent to impede or influence a federal investigation. The statute unambiguously describes the precise conduct the jury found Hunt engaged in when he made a false statement in his police report following Woodard's arrest. A person of ordinary intelligence would understand a police report to be a "record" or "document," and would also read the language "any matter within the jurisdiction of [a] department . . . of the United States" to include an FBI investigation. Moreover, there is nothing ambiguous or unclear about the word "false" or the requirement that the statement be made knowingly and with an intent to impede said investigation. By its plain text, the statute placed Hunt on notice his conduct was unlawful.

Hunt's arguments in large part ignore the language of the statute and attempt to channel this Court's analysis into the unwelcome morass of legislative history and Congressional intent. When the text of a statute is plain, however, we

need not concern ourselves with contrary intent or purpose revealed by the legislative history. *See Harry v. Marchant*, 291 F.3d 767, 772 (11th Cir. 2002) (en banc) (holding courts should follow clear statutory language even where an inquiry into legislative history might reveal contrary Congressional intent); *United States v. Maung*, 267 F.3d 1113, 1121 (11th Cir. 2001) (holding legislative history is irrelevant unless the plain meaning produces absurd results). Hunt makes much of the fact that § 1519 was passed as part of the Sarbanes-Oxley Act, which was targeted at corporate fraud and executive malfeasance. Indeed, the broad language of § 1519 suggests it can be a useful tool in such arenas. But that same breadth bears no hint of any limiting principle cabining § 1519 to corporate fraud cases, and Congress is free to pass laws with language covering areas well beyond the particular crisis *du jour* that initially prompted legislative action. Section 1519 covered Hunt's behavior; the context of passage is of no moment.

Hunt also points to the legislative history to argue § 1519 was concerned primarily with evidence preservation. Here Hunt attempts to tie his argument into the text of the statute by suggesting the language "alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry" assumes there is evidence already existing upon which these acts could be performed. The language of the statute does not support Hunt's reading. Alteration, destruction, mutilation and

8

concealment certainly suggest § 1519 is concerned partially with evidence destruction, but it is not *solely* concerned with destruction or tampering. While Hunt created the document in which he made the false statement, such an act clearly is covered by the language of the statute. Nothing suggests the document mentioned in § 1519 must be already existing at the time the false entry was made. Hunt "ma[de] a false entry" into a "document," all that § 1519 required.

Hunt cannot avoid the result compelled by the plain language by selectively citing legislative history. We hold § 1519's plain language placed Hunt on notice that his action of knowingly making a false statement about the circumstances of Woodard's arrest with the intent to impede an FBI investigation was conduct sufficiently proscribed by § 1519. Hunt's due process right to fair notice was satisfied.

*B. Sufficiency of the Evidence*

Hunt argues the evidence was insufficient to convict him under § 1519 because the evidence shows he simply made a misstatement in his report and did not intentionally make the false statement with the intent to influence, obstruct or impede the federal investigation. Hunt's challenge to the district court's denial of his Rule 29 motion for judgment of acquittal is reviewed de novo, viewing the evidence in the light most favorable to the Government and drawing all reasonable

inferences in favor of the jury's verdict. *United States v. Acosta*, 421 F.3d 1195, 1197 (11th Cir. 2005).[2]

"A factual finding will be sufficient to sustain a conviction if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007) (quotations omitted). The evidence need not be inconsistent with every reasonable hypothesis other than guilt, and we allow the jury to choose among several reasonable conclusions to be drawn from the evidence. *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007).

Adequate circumstantial evidence exists to support the jury's conclusion. The Government put forth evidence Hunt knew claims of excessive force would be investigated by the FBI, and the evidence indicated Hunt stuck to his false statements well after he filed the police report. Agent Glaser's testimony

---

[2] We note Hunt actually raises his sufficiency challenge in two contexts. Aside from appealing the district court's refusal to grant his motion for judgment of acquittal, he also frames his sufficiency challenge in terms of Fed. R. Crim. Pro. 33, arguing the district court erred in failing to grant his request for a new trial because the verdict was against the great weight of the evidence. *See United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993). We review a denial of a request for a new trial under an abuse of discretion standard. *United States v. Pedrick*, 181 F.3d 1264, 1266-67 (11th Cir. 1999). For the same reasons our de novo review of the evidence leads us to conclude the evidence was sufficient to convict Hunt, we find the district court did not abuse its discretion in declining to grant him a new trial.

demonstrated Hunt continued to support his false statements one year after filing the report and only changed his story after being confronted by Glaser. Hunt's statement to Knight immediately after the incident and shortly before filling out the police report–asking Knight whether he had done anything wrong–also provides circumstantial support for the jury's determination on the intent element. A reasonable jury could infer from this exchange that Hunt was aware he may have engaged in wrongful behavior and that this awareness–being close in time to the false statement–influenced the statement in the report.

Moreover, Hunt testified in his own defense. "[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quotations omitted); *see also United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004) ("Defendants in criminal trials are not obliged to testify. And a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case." (quotations omitted)). The defendant's own testimony can be considered by the jury as substantive evidence of his guilt. *Williams*, 390 F.3d at 1325. Hunt says he offered an alternative explanation for the false statement: it was made unintentionally in the heat of the moment. But the jury simply disbelieved him–as it was free to do–and the circumstantial evidence

11

supports its conclusion. As Glaser's testimony indicated, Hunt reiterated the police report's version of the incident in February 2006–nearly one year after the incident occurred. The fact that Hunt reiterated his false version of events so long after they transpired would permit a reasonable jury to conclude his false assertion was not motivated simply by the "heat of the moment." Further casting doubt on Hunt's testimony as to his intent is the fact that the false statement went to one of the most important issues as regards the exercise of force: whether or not Woodard touched Hunt first. A reasonable jury could conclude Hunt's innocent explanation for misstating the paramount fact at issue simply was unworthy of credence. The parties provided evidence of two competing explanations for Hunt's false statement; the jury chose to disbelieve Hunt.

Hunt points to a statement made by the district court at sentencing as supporting his argument that the evidence was insufficient to convict him beyond a reasonable doubt. At sentencing, the judge stated "the evidence would have sufficiently supported either way" the jury's verdict. Hunt takes this to mean the judge believed the evidence was in equipose, which, citing to *Cosby v. Jones*, 682 F.2d 1373 (11th Cir. 1982), means a jury could not find guilt beyond a reasonable doubt. *See id.* at 1383 ("[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt

or a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt."). Read in context, however, the judge's comments are little more than the unexceptional observation that the jury could have reasonably reached either conclusion based on the evidence. The judge merely recognized the jury chose amongst several reasonable explanations for Hunt's behavior. Moreover, our de novo review of the sufficiency question leads us to conclude there was sufficient evidence for a jury to determine Hunt's misstatement was made knowingly with an intent to impede a federal investigation.

## C. Reasonableness of the Sentence

Hunt also argues his 10-month sentence was unreasonable. Hunt does not dispute the court properly calculated his guideline range. The district court calculated the range at 15-21 months, departed downward due to "aberrant behavior" to reach a new range of 10-16 months, and then sentenced Hunt to five months' imprisonment followed by five months' home confinement. Rather, Hunt argues the sentence is unreasonable because, under his circumstances, the only reasonable sentence would be one of probation with no incarceration. We review the substantive reasonableness of a sentence imposed by the district court for abuse of discretion. *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008).

Although we do not automatically presume a sentence within the guidelines range is reasonable, we "ordinarily . . . expect a sentence within the Guidelines range to be reasonable." *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

Hunt's 10-month sentence was not an abuse of discretion. The district court concluded some prison time would be necessary in order to reflect the seriousness of the offense and provide deterrence to keep other officers from writing false reports: "There needs to be a deterrence in this case, a deterrence to other police officers not to do this again. . . . That's why I'm not going to give you a straight probation sentence." The court then sentenced Hunt to the low end of his adjusted range. We reject Hunt's argument that any jail time would be per se unreasonable, as the court's concerns with the serious nature of the crime and the need to deter others were clearly articulated, legitimate concerns factoring into the sentence.

## III. CONCLUSION

For the reasons stated above, Hunt's conviction and sentence are **AFFIRMED**.