[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10252
Non-Argument Calendar

_____

D.C. Docket No. 9:12-cr-80234-DMM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TAMMY LYNN VALDES,
RAFAEL OSCAR VALDES,
a.k.a. Rafael O. Valdez,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 9, 2017)

Before HULL, WILSON and BLACK, Circuit Judges.

PER CURIAM:

Tammy and Rafael Valdes appeal their convictions for one count of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1), and four counts of filing false income tax returns, in violation of 26 U.S.C. § 7206(1). Rafael also appeals his convictions for one count of making a false statement in connection with the sale of firearms, in violation of 18 U.S.C. § 922(a)(6), and one count of selling stolen property, in violation of 18 U.S.C. § 2314. They raise separate issues on appeal, which we address in turn. After review, we affirm their convictions.

## I. DISCUSSION

### A. *Conflict of interest*

Tammy contends a conflict of interest arose at trial because her attorney had formerly represented Rafael and she did not knowingly and voluntarily waive her right to conflict-free representation. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Wheat v. United States*, 486 U.S. 153, 158-59 (1988). This right is violated when the defendant's counsel "has an actual conflict of interest that affects the defendant adversely." *United States v. Rodriguez*, 982 F.2d 474, 477 (11th Cir. 1993). However, a criminal defendant may waive his right to conflict-free counsel. *United States v. Garcia*, 517 F.2d

2

272, 276 (5th Cir. 1975),[1] *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984).

When made aware of a potential conflict of interest, the court should conduct an inquiry, akin to the plea colloquy under Federal Rule of Criminal Procedure 11, to determine whether a defendant wishes to waive the conflict. *Id.* at 278. During the hearing, the court should address the defendant "personally and forthrightly" about the potential consequences of the conflict and elicit a narrative response from the defendant that she has been advised of her right to effective counsel, understands the details of the potential conflict and its consequences, has discussed the matter with her attorney or an independent counsel, and voluntarily waives her right. *Id.* In order to be valid, a waiver must be not only voluntary, but also must be a "knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 276 (quotation omitted). In order for a defendant's waiver to be knowing and intelligent, he must be informed "(1) that a conflict of interest exists; (2) the consequences to his defense from continuing with conflict-laden counsel; and (3) that he has a right to obtain other counsel." *Duncan v. State of Ala.*, 881 F.2d 1013, 1017 (11th Cir. 1989).

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Tammy's Sixth Amendment right to conflict-free representation was not violated. *See Hamilton v. Ford*, 969 F.2d 1006, 1010 (11th Cir. 1992) (reviewing whether a defendant waived his right to conflict-free counsel *de novo*). Tammy's waiver was knowing and intelligent. First, the record shows Tammy knew of the conflict because she acknowledged in both of her waivers of conflict that she had discussed all potential areas of conflict with her counsel. Most importantly, in both waivers of conflict, Tammy stated she had discussed the conflict issues raised by the Government, and the Government addressed the very conflict that she is arguing on appeal she did not know about—her lack of knowledge. The district court also warned Tammy during the second *Garcia* hearing that conflicts of interest could arise before, during, and after trial. Second, Tammy was aware of the consequences because the Government explained in detail in its motion for a *Garcia* hearing, its motion to disqualify her attorney, and at both *Garcia* hearings that Tammy's defenses might be limited by her continued representation by her attorney. Third, Tammy acknowledged she knew she had a right to conflict-free representation at the second *Garcia* hearing. Because Tammy knew of the conflict, had been informed of the potential consequences, and understood she had a right to conflict-free representation and still chose to waive her right, her waiver was valid. *See Duncan*, 881 F.2d at 1017.

4

*B.  Dealing firearms without a license*

Tammy next asserts there was insufficient evidence she knowingly engaged in the business of dealing firearms without a license.  Under 18 U.S.C. § 922(a)(1)(A), it is unlawful for a person to engage in the business of dealing in firearms without a license.  A person is "engaged in the business of selling firearms at wholesale or retail" if she "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."  18 U.S.C. § 921(a)(11)(A), (a)(21)(C).  In contrast, a person does not engage in the business of selling firearms if she "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or . . . sells all or part of [her] personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).  The government must prove the defendant's activity rose above "the occasional sale of a hobbyist," but does not need to show "the defendant's primary business was dealing in firearms or that [she] necessarily made a profit from dealing."  *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981).  "It is enough to prove that the accused has guns on hand or is ready and able to procure them for the purpose of selling them from time to time" for customers.  *Id.*  A conviction requires proof the defendant knew her conduct was unlawful.  *Bryan v. United States*, 524 U.S. 184, 196 (1998).

The district court did not err in denying Tammy's motion for a judgment of acquittal because there is sufficient evidence to conclude Tammy knew her conduct was illegal. *See United States v. Hunt*, 526 F.3d 739, 744 (11th Cir. 2008) (reviewing *de novo* a district court's denial of a Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict). Tammy admitted to knowing a business that sells firearms was required to have a federal firearms license (FFL). She also admitted to having filled out a Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) form, which stated it was unlawful to engage in the business of dealing in guns without an FFL. While she denied knowing she was conducting a business, when viewing the evidence in the light most favorable to the Government, it is reasonable to infer Tammy was aware she was engaging as a business based on the fact that (1) at the gun shows where she sold firearms with Rafael, Tammy referred to her buyers as customers, (2) she called her activity a "hustle," (3) she and Rafael sold a high volume of firearms—600 in 7 years, (4) she offered to search out specific firearms for customers, (5) she discussed which firearms were her best sellers, and (6) she handed out business cards. Therefore, a rational fact-finder could conclude that not only did Tammy know businesses engaging in the sale of firearms were required to have an FFL, but also that Tammy knew her actions qualified as a

6

business, and therefore, her conduct was illegal because she did not have an FFL. Additionally, the jury was entitled to take Tammy's testimony denying knowledge that she was breaking the law as substantive evidence of her guilt. *See United States v. Williams,* 390 F.3d 1319, 1325 (11th Cir. 2004) (stating a defendant who chooses to testify runs the risk of the jury disbelieving her, concluding the opposite of her testimony is true, and considering her statements as substantive evidence of her guilt).

C. *Filing false income tax returns*

Tammy contends there was insufficient evidence she willfully filed false income tax returns and she was entitled to invoke the "innocent spouse" provision of 26 U.S.C. § 6013(e) because she did not prepare the tax documents.

A person has filed false income tax returns, in violation of 26 U.S.C. § 7206(1), if the government can show "(1) [the defendant] willfully made and signed a tax return; (2) the return contained a written declaration that it was made under penalties of perjury; (3) the return was false as to a material matter; and (4) [the defendant] did not subjectively believe that the return was true as to that material matter." *United States v. Hough*, 803 F.3d 1181, 1188 (11th Cir. 2015); *see* 26 U.S.C. § 7206(1).

26 U.S.C. § 6013(e) was repealed in 1998. *See* 26 U.S.C. § 6013(e). Section 6015 of Title 26 currently provides for the possibility of relief from joint

and several liability on a joint tax return.  Under this section, a person may elect to seek relief from liability if:

> (A) a joint return has been made for a taxable year; (B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return; (C) [she] establishes that in signing the return . . . she did not know, and had no reason to know, that there was such understatement; (D) taking into account all the facts and circumstances, it is inequitable to hold [her] liable for the deficiency in tax for such taxable year attributable to such understatement; and (E) [she] elects . . . the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities [for her].

26 U.S.C. § 6015(a)(1), (b)(1)(A)-(E).  The wording of the former Section 6013(e) of Title 26 is substantially the same as the wording of Section 6015 of Title 26. *See* 26 U.S.C. § 6013(e) (repealed in 1998); *see also* 26 U.S.C. § 6015.

The district court did not plainly err by not applying the innocent spouse exception because the exception applies to tax liability, not criminal liability, and there is no binding precedent that extends it to criminal prosecutions for tax fraud. *See United States v. Bonilla*, 579 F.3d 1233, 1238 (11th Cir. 2009) (stating we review issues raised for the first time in a direct appeal for plain error only). Therefore, Tammy cannot show there was an error that was obvious and clear under current law because neither this Court nor the Supreme Court have applied § 6013(e) in a criminal context.  *See United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999) ("A plain error is an error that is 'obvious' and is 'clear under current law.'").

8

The district court did not err by denying Tammy's motion for a judgment of acquittal because there was sufficient evidence to conclude she did not believe the tax return was true.[2] *See Hunt*, 526 F.3d at 744 (reviewing sufficiency argument *de novo*). Tammy's actions support the conclusion she knew about the additional income. She was heavily involved in the gun show sales, and as discussed above, there was sufficient evidence that Tammy knew she and Rafael were conducting a business. Tammy also knew about Rafael's GunBroker.com activity and had even helped with a purchase, and deposited the rent checks. Furthermore, the money from Rafael's GunBroker.com sales went into a bank account with her name on it. Therefore, even if Tammy did not know the exact numbers, it was not unreasonable for a fact-finder to conclude Tammy had knowledge she and Rafael were earning more than just their salaries. Furthermore, the jury was entitled to disbelieve Tammy's complete denials of knowledge and take them as substantive evidence of her guilt. *See Williams,* 390 F.3d at 1325.

## D.  Selling stolen property

Rafael contends there was insufficient evidence he sold stolen property or that the property had a value of at least $5,000. A defendant violates 18 U.S.C. § 2314 if (1) he transports goods in interstate commerce, (2) those goods had a value of $5,000 or more, and (3) he knew the goods were "stolen, converted or

---

[2]   Tammy only disputes the last element, which is whether she believed the return was truthful.

taken by fraud." Value is defined as "the face, par, or market value, whichever is the greatest, and the aggregate value of all goods . . . referred to in a single indictment shall constitute the value thereof." 18 U.S.C. § 2311.

The district court did not err in denying Rafael's motion for a judgment of acquittal because there was sufficient evidence to conclude he knowingly transported more than $5,000 in stolen goods. First, there was sufficient evidence to conclude the gun parts Rafael sold online were stolen. Through his employment with the Hialeah Police Department (HPD), Rafael had access to all the firearms on the destruction logs, and Agent Barborini testified that the types of firearms that were listed in the destruction logs, including some rare types of firearms, were consistent with the type of firearms parts that Rafael sold online. Furthermore, the Government was able to show that two of Rafael's online gun parts sales definitively matched to firearms on the destruction log. Additionally, it was unusual to sell parts kits without a frame unless the parts were obtained for free, and therefore, Rafael's ability to sell so many part kits aligns with the undisputed fact he had access to parts from the HPD destruction logs. Second, there was sufficient evidence to conclude the stolen goods had a total value that exceeded $5,000, because an ATF forensic auditor was able to match the online advertisements to money order payments that Rafael had received. He was able to total the money orders and concluded Rafael sold more than $6,000 in gun parts.

10

The $6,000 represents the value of the firearm parts because that is the price a buyer was willing to pay. *See United States v. Robinson*, 687 F.2d 359, 360 (11th Cir. 1982) (stating if the goods have no face or par value, the market value is "the price a willing buyer would pay . . . either at the time and the place that the property was stolen or at any time during the receipt or concealment of the property"). Because the $6,000 figure was the total gun parts sales from August 2008 to March 2009, it is possible to infer the sales of stolen parts from September 2008 to March 2009, the time period charged in the indictment, exceeded $5,000. Third, because the evidence supported the conclusion Rafael personally stole the firearm parts, there was sufficient evidence to conclude Rafael knew the goods were stolen. Moreover, the jury was entitled to consider Rafael's testimony as substantive evidence of his guilt. *Williams,* 390 F.3d at 1325. Accordingly, because a rational factfinder could have reasonably concluded Rafael is guilty, we affirm. *Brown*, 665 F.3d at 1248.

*E.  Expert testimony*

Rafael also asserts the district court erred by allowing Agent Barborini to testify that firearm parts sold by Rafael were of the same type as firearms listed on the HPD property destruction logs because the district court did not evaluate Barborini's methodology or reliability and the testimony was highly prejudicial.

Rule 702 of the Federal Rules of Evidence states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The district court performs a gatekeeping function by requiring that scientific and technical expert testimony meets the standards of Rule 702. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

In determining the admissibility of expert testimony, trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;[3] and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* The proponent of the expert testimony bears the burden of showing his expert meets those three factors. *Id*.

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993) (holding the Federal Rules of Evidence required the trial judge to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand).

To assess the reliability of an expert opinion, the court considers a number of factors, including those listed by the Supreme Court in *Daubert*: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1262. The *Daubert* factors are only illustrative and may not all apply in every case. *Id.*

The district court did not abuse its discretion by admitting Barborini as an expert witness and allowing him to testify. *See id.* at 1258 (stating we review a district court's decisions pertaining to the admissibility and reliability of expert testimony and opinion for an abuse of discretion). First, Barborini's years of experience working with firearms and familiarizing himself with the manufacturers and their products made him qualified as a firearms identification expert. Second, Barborini's methodology was sufficiently reliable. The factors outlined in *Daubert* are inapplicable here, as the methodology in this case involves mere identification and comparison, but since those factors are merely illustrative, that does not mean that Barborini's testimony was inadmissible. *Id.* at 1262. As already established, Barborini's experience made him qualified to identify firearms, and it follows that someone who is qualified as an expert in firearm identification would be able to determine the make and models of the firearms listed in the HPD destruction logs

13

or Rafael's advertisements.  Furthermore, Rafael's firearms identification expert did not testify an expert would not be able to look at a firearm part and identify the make and model of the firearm.  He only said that, without serial numbers, it would be impossible to tell whether two guns of the same make and model were the same particular firearm, but Barborini admitted as much in his own testimony.  The fact Barborini could not definitively testify the parts matched the firearms in the HPD destruction logs or that Rafael had stolen the parts he sold goes to the weight of the testimony, not the reliability of his methods or the admissibility of his testimony.

Furthermore, even if the district court abused its discretion, the error was harmless.  Without Barborini's testimony, there was still evidence Rafael had unique access to a source of gun parts, the sale of gun part sets was unusual and not ordinarily profitable, on two occasions Rafael sold gun parts with serial numbers that matched firearms from the HPD destruction logs, and Rafael received over $6,000 from selling gun parts online.  A reasonable factfinder could conclude from that evidence that Rafael was guilty.  Additionally, the jury was entitled to disbelieve Rafael's denials and take his testimony as substantive evidence of guilt. *Williams,* 390 F.3d at 1325.

## II.  CONCLUSION

Accordingly, we affirm the Valdeses' convictions.

**AFFIRMED.**

14