[DO NOT PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-10609

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ADEDEJI ADENIRAN,
a.k.a. TONY,
a.k.a. AARE,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:05-cr-00024-RH-MAF-1

————————————

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Adedeji Adeniran appeals his 75-month sentence, which was imposed after he pled guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and two counts of bank fraud, in violation of 18 U.S.C. § 1344. Adeniran challenges his sentence as substantively unreasonable. Because the district court did not abuse its discretion, we affirm.

## I.    BACKGROUND

This case arises out of Adeniran's participation in a conspiracy that defrauded federally insured credit unions and banks.

From 2002 through 2004, Adeniran and his co-conspirators fraudulently opened new accounts at financial institutions around the country, including some in the Tallahassee, Florida area. To open the accounts, they mailed or faxed applications to financial institutions, assuming the identities of real individuals and using those victims' names, birth dates, and social security numbers. Adeniran and his co-conspirators created fake identification cards and documents to support the fraudulent applications.

After opening accounts, Adeniran and his co-conspirators deposited counterfeit or fraudulent checks, money orders, or wire transfers into the accounts. When money was successfully deposited into an account, Adeniran or another co-conspirator withdrew or transferred the funds, often sending the money overseas.

As part of the scheme, Adeniran and his co-conspirators called the financial institutions to check on the status of pending deposits. During these calls, they took steps to keep the financial institutions from discovering their true identities. They would pose as the individuals whose names and other identifying information were used to open the accounts. They also would use technology to conceal from the financial institutions' caller identification systems the phone numbers they were using and the locations from which they were calling.

After a credit union in Florida reported fraudulent transactions, the Federal Bureau of Investigation (FBI) opened an investigation. The investigation uncovered that the conspiracy had opened fraudulent accounts at more than 45 financial institutions, using the identities of approximately 150 individuals.

The FBI's investigation uncovered that Adeniran played a central role in the scheme. Adeniran, who lived in Miami, worked with other leaders of the conspiracy who were based in Chicago and New York. Adeniran and these leaders shared information about stolen identities that could be used to open new accounts and also sent each other fraudulent checks to be deposited in the accounts.

Adeniran worked particularly closely with Stephen Adetona to operate the scheme. Adeniran and Adetona spoke about ten times per day to plan which banks to target and when to withdraw deposited funds from the fraudulently opened accounts. While the scheme was operating, Adeniran, who was born in Nigeria, made several trips there, staying for months at a time. When he was out of the United States, Adeniran relied on Adetona to run operations for him, including maintaining contact with the co-conspirators in New York and Chicago.

Adeniran also directed lower-level participants in the scheme to take actions designed to keep financial institutions from detecting the fraudulent activity. Adeniran had individuals pick up mail sent by banks in connection with the fraudulent accounts[1] and pose as accountholders to answer calls from the banks.

In 2005, a grand jury returned a 27-count indictment charging Adeniran and seven other individuals, including Adetona, with conspiracy to commit bank fraud and bank fraud. The United States was unable to arrest Adeniran immediately. He remained a fugitive until 2019 when he was extradited from Nigeria

---

[1] According to the government, Adeniran did this to make it harder for the government to trace the fraudulent scheme back to him by removing himself from direct contact with mail sent from the financial institutions to the accountholders.

to the United States.[2] After returning to the United States, Adeniran pled guilty to one count of conspiracy to commit bank fraud and two counts of bank fraud.[3]

Prior to the sentencing hearing, the probation office prepared a presentence investigation report ("PSR"). The PSR described the scope of the conspiracy and Adeniran's role in the offense.

The PSR identified the relevant loss amount. It reported that the government had identified over 300 fraudulent deposits totaling over $5,000,000 that were tied to the fraudulent scheme. But the PSR used a much lower amount, $600,000, as the relevant loss amount to calculate Adeniran's guidelines range. Because of the age of the transactions and the amount of time between the investigation and Adeniran's arrest, the United States had said that it could prove a loss amount of $600,000.

The PSR calculated Adeniran's offense level.[4] The PSR assigned Adeniran a base offense level of 7. *See* U.S.S.G.

---

[2] Shortly after the indictment was returned, the indictment was unsealed as to Adeniran. Even though Adeniran had not been arrested, the government requested that the indictment be unsealed as to him because Adeniran was "apparently aware that law enforcement [was] looking for him." Doc. 8 at 2.

"Doc." numbers refer to the district court's docket entries.

[3] The government agreed to dismiss the other charges against Adeniran.

[4] The PSR used the 2004 version of the Guidelines Manual. *See* U.S.S.G. § 1B1.11(b)(1) (explaining that a sentencing court generally should use the

§ 2B1.1(a)(1) (2004). Based on a $600,000 loss amount, the PSR applied a 14-level enhancement. *See id.* § 2B1.1(b)(1)(H) (14-level enhancement for offenses involving losses between $400,000 and $1,000,000). The PSR also applied several other enhancements: (1) a two-level enhancement because a substantial part of the fraudulent scheme was committed outside the United States or because the fraudulent scheme involved sophisticated means, *id.* § 2B1.1(b)(9); (2) a two-level enhancement because the offense involved the unauthorized transfer or use of any means of identification to produce or obtain other means of identification or the possession of five or more means of identification that were produced from, or obtained by, the use of another means of identification, *id.* § 2B1.1(b)(10); and (3) a four-level enhancement because Adeniran was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, *id.* § 3B1.1(a).[5]

---

Guidelines Manual in effect on the date of a defendant's sentencing unless using that manual would violate the *Ex Post Facto* Clause of the Constitution); *United States v. Siegelman*, 786 F.3d 1322, 1330 n.8 (11th Cir. 2015).

[5] The PSR did not apply an enhancement based on the number of victims. *See* U.S.S.G. § 2B1.1(b)(2) (2004). Under the applicable guideline, to qualify as a victim, a person had to sustain an actual loss that was used to calculate the relevant loss amount. Using the $600,000 loss amount, the United States conceded that it could not prove a sufficient number of victims sustained a loss to support the enhancement. *See United States v. Foley*, 508 F.3d 627, 633–34 (11th Cir. 2007).

After applying a three-level reduction for acceptance of responsibility, *see id.* § 3E1.1, the PSR calculated Adeniran's total offense level as 26. This total offense level combined with Adeniran's criminal history category of I yielded a recommended range of 63 to 78 months' imprisonment.

The PSR noted that a sentence outside the guidelines range could be warranted to avoid unwarranted sentencing disparities. When Adetona was sentenced in 2006, he had been assigned a total loss amount of approximately $5,400,000. The PSR suggested that there could be an unwarranted sentencing disparity because, as a result of complications due to the long period of time between Adeniran's indictment and arrest, he was being held responsible for a significantly lower loss amount than Adetona, which resulted in a lower guidelines range.

At the sentencing hearing, the district court adopted the PSR's guidelines calculation. Adeniran argued that the § 3553(a) factors[6] supported a downward variance and asked the district

---

[6] Under § 3553(a), the district court is required to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the statute. 18 U.S.C. § 3553(a). These purposes include the need to: reflect the seriousness of the offense; promote respect for the law; provide just punishment; deter criminal conduct; protect the public from the defendant's future criminal conduct; and effectively provide the defendant with educational or vocational training, medical care, or other correctional treatment. *Id.* § 3553(a)(2). The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sen-

court to impose a sentence below the guidelines range. He argued that a shorter sentence was warranted because he had no criminal history, was unlikely to recidivate, accepted responsibility, and cooperated with the government after his arrest. Adeniran also asked the court to consider that he had been held in pretrial detention since his extradition and contracted COVID-19 while incarcerated, he had preexisting health conditions, and his incarceration had imposed hardships on his family.

The government opposed Adeniran's request for a variance and requested a sentence at the bottom of the guidelines range. The government pointed out that it had to extradite Adeniran from Nigeria, the case involved significant fraud, and Adeniran was a leader of the conspiracy.

After weighing all of the § 3553(a) factors, the court imposed a sentence of 75 months. In addressing the nature and circumstances of the offense, the court explained that there were a significant number of individuals who had their identities stolen and the offense occurred over a lengthy period of time.

The court also expressly weighed the need to avoid unwarranted sentencing disparities among defendants with similar rec-

---

tences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. *Id.* § 3553(a)(1), (3)-(7).

ords who had been found guilty of similar conduct. The court noted that Adetona, who was involved in the "very same conspiracy" and was Adeniran's "right[-]hand man," had been held responsible at his sentencing for a substantially greater loss amount. Doc. 289 at 23. If Adeniran had been held responsible for the same loss amount as Adetona, the court observed, his guidelines range would have been 97 to 121 months. The court observed that the 75-month sentence it was imposing was well below this range. The court cautioned that it was not actually holding Adeniran responsible for this greater loss amount in calculating his guidelines range but simply was considering the need to avoid an unwarranted sentencing disparity.

The court also discussed considerations that implicated other § 3553(a) factors. Regarding Adeniran's history and characteristics, the court acknowledged that he had no criminal history but observed that this lack of criminal history was already captured in Adeniran's criminal history score of I. The court also considered that since Adeniran was extradited from Nigeria, he had fully cooperated and that he would be serving his term of incarceration during the COVID-19 pandemic.

This is Adeniran's appeal.

## II.    DISCUSSION

Adeniran challenges the substantive reasonableness of his sentence. We review the reasonableness of a sentence under a deferential abuse of discretion standard. *Gall v. United States*,

552 U.S. 38, 41 (2007). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (internal quotation marks omitted). The party challenging the sentence bears the burden of showing it is unreasonable in light of the record and § 3553(a) factors. *United States v. Tome*, 611 F.3d. 1371, 1378 (11th Cir. 2010).

When reviewing a sentence for substantive reasonableness, we examine the totality of the circumstances, including "whether the statutory factors in § 3553(a) support the sentence in question." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). "We will not second guess the weight (or lack thereof) that the judge accorded to a given factor under § 3553(a), as long as the sentence ultimately imposed is reasonable in light of *all* the circumstances presented." *United States v. Snipes*, 611 F.3d 855, 872 (11th Cir. 2010) (alterations adopted) (internal quotation marks omitted). We may vacate a sentence only if we firmly believe that the district court "committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (internal quotation marks omitted). We may not set aside a sentence "merely because we would have decided that another one is more appropriate." *Id.* at 1191. "Although we do not automatically presume a sentence within

the guidelines range is reasonable, we ordinarily expect a sentence within the Guidelines range to be reasonable." *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (alteration adopted) (internal quotation marks omitted).

Adeniran argues that the district court abused its discretion by failing to impose a sentence at, or below, the bottom of the guidelines range. We begin by observing that Adeniran's sentence was far below the 360-month statutory maximum and within the applicable guidelines range. Although we do not presume that a sentence within the guidelines range is reasonable, we ordinarily expect it to be reasonable. *See id.*

Adeniran claims that the district court "placed too great of an emphasis on" the need to avoid unwarranted sentencing disparities and failed to give sufficient weight to his lack of criminal history and the fact that he cooperated. Appellant's Br. at 26. Adeniran, in effect, asks us to "second guess the weight" that the district court assigned to particular § 3553(a) factors. *Snipes*, 611 F.3d at 872.

Given the circumstances of this case, we conclude that the district court's decision to impose a sentence near the top of Adeniran's guidelines range was reasonable. Adeniran was a leader in a conspiracy that operated over an approximately two-year period and opened fraudulent accounts at more than 45 financial institutions, using identities stolen from approximately 150 individuals. Even though the district court found for purposes of the guidelines calculation that the loss amount was $600,000, we can-

not say that the district court abused its discretion in considering that using this loss amount potentially created an unwarranted sentencing disparity. Adeniran had been a fugitive for over a decade, and the government explained that it was unable to establish a higher loss amount because, due to the passage of time, some relevant documents, including bank records, had become unavailable. In these circumstances, the district court was permitted to consider that when Adetona, Adeniran's "right[-] hand man," had been sentenced years earlier for the same conspiracy, he was held responsible for a substantially greater loss amount.[7] Doc. 289 at 23. We thus conclude that the district court did not abuse its considerable discretion in imposing a 75-month sentence in this case. *See Irey*, 612 F.3d at 1190.

## III.    CONCLUSION

For these reasons, we affirm Adeniran's sentence.

---

[7] Adeniran, who is represented by new counsel on appeal, suggests that his attorney in the district court had no way to know, prior to receiving the PSR, about the disparity in loss amounts. In fact, this information was publicly available. Adetona had appealed his sentence, challenging the district court's loss calculation. Our opinion affirming Adetona's sentence disclosed the exact loss amount. *See United States v. Adetona*, 251 F. App'x 610, 612 (11th Cir. 2007) (unpublished) (stating that Adetona's "amount of actual and intended loss [was] approximately $5.4 million"). It is hard to believe that Adeniran's attorney was surprised when the PSR identified that there may be an unwarranted potential sentencing disparity based on the substantial difference between Adeniran's and Adetona's loss amounts.

AFFIRMED.