[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12641

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE ROBERTO GARCIA ARROYO,
a.k.a. Jose Garcia Arroyo,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:20-cr-00017-AW-GRJ-1

_____

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM and GRANT, Circuit Judges.

PER CURIAM:

Jose Roberto Garcia Arroyo appeals his sentence of 135 months of imprisonment following his pleas of guilty to conspiring to possess and to possessing with intent to distribute five kilograms or more of cocaine. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 846; 18 U.S.C. § 2. Garcia Arroyo challenges the denial of safety-valve relief, United States Sentencing Guidelines Manual § 5C1.2 (Nov. 2018), and the substantive reasonableness of his sentence. We affirm.

Two confidential informants tipped off federal agents that Garcia Arroyo regularly received packages from Puerto Rico marked for priority delivery to other persons living in different apartment complexes, including the Savannah apartments in Gainesville, Florida, where Garcia Arroyo was the maintenance supervisor. Agents obtained records from the United States Postal Inspection Service that confirmed it had delivered 110 packages received from Carolina, Puerto Rico, to various apartments in the Savannah and Hampton Oaks complexes between August 2019 and June 2020. The packages averaged between five and six pounds, but some were as heavy as 19 pounds. And agents intercepted one package addressed to the Savannah complex containing two kilograms of cocaine concealed inside the box of a child's toy.

On June 11, 2020, after the Postal Service alerted federal agents that there were several packages incoming from Puerto Rico addressed to residences in the two apartment complexes, the agents watched Garcia Arroyo collect the packages and then stopped him for a traffic offense. Garcia Arroyo consented to a search of his truck, a police canine alerted to the presence of drugs, and agents seized six packages containing 12 kilograms of cocaine. The next day, agents intercepted a seventh package from Puerto Rico addressed to a Hampton Oaks apartment at a post office in Jacksonville, Florida. The package weighed about six pounds and contained two kilograms of cocaine.

D.H. admitted to postal officers that he tracked parcels and coordinated deliveries with Garcia Arroyo. D.H. acknowledged that he had been paid occasionally and received $50 for delivering the six packages found in Garcia Arroyo's truck. Agents searched Garcia Arroyo's office at the apartment complex and found a ledger that listed the addresses and names for shipments, corresponding tracking numbers, and dates of their delivery.

Garcia Arroyo confessed that he had received packages of cocaine from Puerto Rico through the mail from a man named Leon for about a year. Garcia Arroyo stated that he transported the packages to Orlando or Kissimmee, where they were retrieved from his truck, which he left unlocked in a prearranged location. Garcia Arroyo received $150 for each shipment.

Later, Garcia Arroyo proffered that the packages came from Tato, a man with whom he had developed a friendship more than

a decade earlier while still living in Puerto Rico. Garcia Arroyo borrowed $2,500 from Tato, who agreed to deduct $150 from the loan each time Garcia Arroyo accepted a package of what he thought were stolen auto parts. Garcia Arroyo communicated with Tato through WhatsApp or a cellular telephone with a number that changed frequently, multiple couriers collected packages that Garcia Arroyo marked with names and code numbers Tato provided, and Garcia Arroyo traveled to Orlando to facilitate weekend deliveries and to meet Tato and his wife. Despite their extended relationship and Garcia Arroyo's ability to describe Tato's appearance, unique body markings, and routines when in Florida, he was unable to confirm that Tato was the man's real name or alias. Garcia Arroyo professed to befriending D.H. to deliver packages early in the day and paying him $150 per box delivered, despite receiving only $150 per shipment. And Garcia Arroyo admitted to instructing his wife in a recorded jailhouse call to discard a duplicate of his shipment ledger that he kept at home.

Garcia Arroyo implicated a man named Willis as a drug distributor, but federal agents arrested Willis during a separate sting operation and verified his story about being a street salesman. Willis stated that Garcia Arroyo received deliveries of multiple kilograms of cocaine, he kept stacks of money, and he was third in line in a drug trafficking operation. Federal agents credited Willis's statement after independently verifying his statements about his role in his drug scheme and reviewing the entries in Garcia

Arroyo's office ledger, which were consistent with dividing large amounts of cocaine and reselling smaller quantities of the drug.

Garcia Arroyo's presentence investigation report provided a base offense level of 36 based on the 234 kilograms of cocaine he received in the 117 packages. The presentence report recommended granting a three-level reduction for acceptance of responsibility, see U.S.S.G. § 3E1.1, but denying Garcia Arroyo safety-valve relief, see id. § 5C1.2. Based on Garcia Arroyo's total offense level of 33 and criminal history category of I, the report provided an advisory guideline range of 135 to 168 months of imprisonment.

Garcia Arroyo objected to the recommended denial of safety-valve relief. At sentencing, a federal agent testified that he was unable to find Tato. The agent determined that Garcia Arroyo's proffer was untruthful and incomplete.

The district court denied Garcia Arroyo's request for safety-valve relief and sentenced him to 135 months of imprisonment. The district court discredited Garcia Arroyo's proffers that he did not know the names for Tato or any of the couriers and that he profited less than D.H. The district court also found that Garcia Arroyo's inconsistent statements and ledger revealed that he had withheld information about his role and the size of the conspiracy.

The district court did not clearly err by denying Garcia Arroyo safety-valve relief. To qualify for the safety valve, a defendant must "truthfully provide[] to the Government all information and evidence [he] has concerning the offense or offenses that were part

of the same course of conduct or of a common scheme or plan
. . . ." U.S.S.G. § 5C1.2(a)(5). The record supports the findings of
the district court that Garcia Arroyo's proffer "about his involve-
ment in the offense, including information relating to the involve-
ment of others and to the chain of the narcotics distribution" was
incomplete and inconsistent. *See United States v. Cruz*, 106 F.3d
1553, 1557 (11th Cir. 1997). He withheld identifying information
about his longtime contact in Puerto Rico and the drug couriers,
and he omitted details about the scope of the drug organization.
Garcia Arroyo's ledger contradicted his story about being a "mid-
dleman drug mule." And, as the district court stated, it was "inher-
ently incredible " that a "postal carrier . . . [with] sole interaction"
with Garcia Arroyo made "more money . . . than he d[id]." The
district court did not clearly err in finding that Garcia Arroyo failed
to satisfy the criteria for safety-valve relief.

The district court did not abuse its discretion by sentencing
Garcia Arroyo to 135 months of imprisonment. The district court
reasonably determined that the sentence was necessary to punish
Garcia Arroyo for serving as an "extremely essential component in
a large scale drug trafficking organization" involving a "tremen-
dous amount of cocaine" and to deter him and "other people who
want to get involved" from committing similar future crimes. *See*
18 U.S.C. § 3553(a). The district court declined to impose "a greater
sentence [despite] the volume of the drugs" because Garcia Arroyo
"did plead guilty and accept responsibility," had no criminal his-
tory, and expressed remorse for his crime. Garcia Arroyo's

21-12641          Opinion of the Court          7

sentence, which is well below his statutory maximum sentence of life imprisonment and within his advisory guideline range, is reasonable. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1256–57 (11th Cir. 2015); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

We **AFFIRM** Garcia Arroyo's sentence.